WEST LYNN CREAMERY, INC., ET AL. *v.* HEALY,
COMMISSIONER OF MASSACHUSETTS DEPART-
MENT OF FOOD AND AGRICULTURE

No. 93–141.   Argued March 2, 1994—Decided June 17, 1994

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 207. REHNQUIST, C. J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 212.

*Steven J. Rosenbaum* argued the cause for petitioners. With him on the briefs were *Michael L. Altman* and *Robert A. Long, Jr.*

*Douglas H. Wilkins,* Assistant Attorney General of Massachusetts, argued the cause for respondent. With him on the brief were *Scott Harshbarger,* Attorney General, and *Eric E. Smith,* Assistant Attorney General.*

JUSTICE STEVENS delivered the opinion of the Court.

A Massachusetts pricing order imposes an assessment on all fluid milk sold by dealers to Massachusetts retailers. About two-thirds of that milk is produced out of State. The entire assessment, however, is distributed to Massachusetts dairy farmers. The question presented is whether the pricing order unconstitutionally discriminates against interstate commerce. We hold that it does.

I

Petitioner West Lynn Creamery, Inc., is a milk dealer licensed to do business in Massachusetts. It purchases raw milk, which it processes, packages, and sells to wholesalers, retailers, and other milk dealers. About 97% of the raw milk it purchases is produced by out-of-state farmers. Petitioner LeComte's Dairy, Inc., is also a licensed Massachusetts milk dealer. It purchases all of its milk from West Lynn and distributes it to retail outlets in Massachusetts.

Since 1937, the Agricultural Marketing Agreement Act, 50 Stat. 246, as amended, 7 U. S. C. § 601 *et seq.,* has authorized the Secretary of Agriculture to regulate the minimum prices

---

*Briefs of *amici curiae* urging reversal were filed for Cumberland Farms, Inc., by *Allan Afrow;* and for the Milk Industry Foundation et al. by *Steven J. Rosenbaum* and *Robert A. Long, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the State of New Jersey by *Fred DeVesa,* Acting Attorney General, *Mary Carol Jacobson,* Assistant Attorney General, and *Gregory Romano,* Deputy Attorney General; and for the Massachusetts Association of Dairy Farmers et al. by *Erwin N. Griswold, Gregory A. Castanias,* and *Allen Tupper Brown.*

*Jeffrey L. Amestoy,* Attorney General of Vermont, and *Eileen I. Elliott,* Assistant Attorney General, filed a brief of *amicus curiae* for the State of Vermont.

paid to producers of raw milk by issuing marketing orders for particular geographic areas.[1]  While the Federal Government sets minimum prices based on local conditions, those prices have not been so high as to prevent substantial competition among producers in different States.  In the 1980's and early 1990's, Massachusetts dairy farmers began to lose market share to lower cost producers in neighboring States.  In response, the Governor of Massachusetts appointed a Special Commission to study the dairy industry. The commission found that many producers had sold their dairy farms during the past decade and that if prices paid to farmers for their milk were not significantly increased, a majority of the remaining farmers in Massachusetts would be "forced out of business within the year."  App. 13.  On January 28, 1992, relying on the commission's report, the Commissioner of the Massachusetts Department of Food and Agriculture (respondent) declared a State of Emergency.

---

[1] The minimum price is a "blend price" that is determined, in part, by the ultimate use of the raw milk.  See 7 CFR § 1001.1 *et seq.* (1993).  Raw milk used to produce fluid milk products has the highest price and is characterized in the federal order as "Class I" milk.  Milk used for other products, such as eggnog, sour cream, and hard cheese, bears a lower price and is characterized as "Class II" and "Class III" milk.  Each dealer is required to file a monthly report of its raw milk purchases and the use to which that milk is put.  In computing the monthly blend price, the Federal Market Administrator calculates the weighted average price of the various classes of milk.  If Class I milk predominates in the dealer reports, the blend price is high; if other classes predominate, the blend price is lower.  Although all of the farmers are paid the same minimum blend price regardless of the use to which their milk is put, dealers who sell more than an average amount of Class I products pay a higher per unit price than those with relatively lower Class I sales.  The federal marketing order thus provides a uniform blend price for sellers of raw milk while imposing nonuniform payment obligations on the dealers purchasing that milk.  The federal order does not prohibit the payment of prices higher than the established minima.  Like the federal order, the Massachusetts order requires dealers to make payments into a fund that is disbursed to farmers on a monthly basis.  The assessments, however, are only on Class I sales and the distributions are only to Massachusetts farmers.

In his declaration he noted that the average federal blend price[2] had declined from \$14.67 per hundred pounds (cwt) of raw milk in 1990 to \$12.64/cwt in 1991, while costs of production for Massachusetts farmers had risen to an estimated average of \$15.50/cwt. *Id.*, at 27. He concluded:

> "Regionally, the industry is in serious trouble and ultimately, a federal solution will be required. In the meantime, we must act on the state level to preserve our local industry, maintain reasonable minimum prices for the dairy farmers, thereby ensure a continuous and adequate supply of fresh milk for our market, and protect the public health." *Id.*, at 31.

Promptly after his declaration of emergency, respondent issued the pricing order that is challenged in this proceeding.[3]

The order requires every "dealer"[4] in Massachusetts to make a monthly "premium payment" into the "Massachusetts Dairy Equalization Fund." The amount of those payments is computed in two steps. First, the monthly "order premium" is determined by subtracting the federal blend price for that month from \$15 and dividing the difference by three; thus if the federal price is \$12/cwt, the order premium is \$1/cwt.[5] Second, the premium is multiplied by the amount

---

[2] For an explanation of the term "blend price," see the previous footnote.

[3] The order was first issued on February 18, 1992, and amended on February 26, 1992. App. 32–40; Brief for Respondent 4–5. Only the amended order is at issue in this case.

[4] A "dealer" is defined as "any person who is engaged within the Commonwealth in the business of receiving, purchasing, pasteurizing, bottling, processing, distributing, or otherwise handling milk, purchases or receives milk for sale as the consignee or agent of a producer, and shall include a producer-dealer, dealer-retailer, and sub-dealer." App. 32–33.

[5] App. 35–36; *West Lynn Creamery, Inc.* v. *Commissioner of Dept. of Food and Agriculture,* 415 Mass. 8, 11, n. 10, 611 N. E. 2d 239, 241, n. 10 (1993). The commissioner appears to have set the order premium at only a third of the difference between the federal price and \$15 because Massachusetts farmers produce only about one-third of the milk sold as fluid milk in the State. App. 21. Since Massachusetts dairy farmers produce

(in pounds) of the dealer's Class I[6] sales in Massachusetts. Each month the fund is distributed to Massachusetts producers.[7] Each Massachusetts producer receives a share of the total fund equal to his proportionate contribution to the State's total production of raw milk.[8]

Petitioners West Lynn and LeComte's complied with the pricing order for two months, paying almost $200,000 into the Massachusetts Dairy Equalization Fund. *Id.*, at 100, 105. Starting in July 1992, however, petitioners refused to make the premium payments, and respondent commenced license revocation proceedings. Petitioners then filed an action in state court seeking an injunction against enforcement of the order on the ground that it violated the Commerce Clause of the Federal Constitution. The state court denied relief and respondent conditionally revoked their licenses.

The parties agreed to an expedited appellate procedure, and the Supreme Judicial Court of Massachusetts transferred the cases to its own docket. It affirmed, because it concluded that "the pricing order does not discriminate on its face, is evenhanded in its application, and only incidentally

---

one-third of the milk, an assessment of one-third the difference between $15 and the federal minimum price generates enough revenue to give Massachusetts dairy farmers the entire difference between $15 and the federal minimum price without leaving any surplus. By paying Massachusetts dairy farmers the entire difference between $15 and the federal minimum price, the order premium allows Massachusetts farmers whose cost of production is $15/cwt to sell their milk without loss at the federal minimum price.

[6] For an explanation of the term "Class I," see n. 1, *supra.*

[7] A "producer" is defined as "any person producing milk from dairy cattle." App. 33.

[8] The disbursement is subject to two qualifications. First, any farmer who produced more than 200,000 pounds of milk is considered to have produced only 200,000 pounds. Second, no producer may receive payments that make its net price per cwt (including both the federal minimum price and payments from the Equalization Fund) higher than $15/cwt. If these limitations lead to a surplus in the Dairy Equalization Fund, the surplus is returned to the dealers. *Id.*, at 36–38.

burdens interstate commerce." *West Lynn Creamery, Inc.* v. *Commissioner of Dept. of Food and Agriculture,* 415 Mass. 8, 15, 611 N. E. 2d 239, 243 (1993). The court noted that the "pricing order was designed to aid only Massachusetts producers." *Id.,* at 16, 611 N. E. 2d, at 244. It conceded that "[c]ommon sense" indicated that the plan has an "adverse impact on interstate commerce" and that "[t]he fund distribution scheme does burden out-of-State producers." *Id.,* at 17, 611 N. E. 2d, at 244. Nevertheless, the court asserted that "the burden is incidental given the purpose and design of the program." *Id.,* at 18, 611 N. E. 2d, at 244. Because it found that the "local benefits" provided to the Commonwealth's dairy industry "outweigh any incidental burden on interstate commerce," it sustained the constitutionality of the pricing order. *Id.,* at 19, 611 N. E. 2d, at 245. We granted certiorari, 510 U. S. 811 (1993), and now reverse.

## II

The Commerce Clause vests Congress with ample power to enact legislation providing for the regulation of prices paid to farmers for their products. *United States* v. *Darby,* 312 U. S. 100 (1941); *Wickard* v. *Filburn,* 317 U. S. 111 (1942); *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.,* 334 U. S. 219 (1948). An affirmative exercise of that power led to the promulgation of the federal order setting minimum milk prices. The Commerce Clause also limits the power of the Commonwealth of Massachusetts to adopt regulations that discriminate against interstate commerce. "This 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. . . . Thus, state statutes that clearly discriminate against interstate commerce are routinely struck down . . . unless the discrimination is demonstrably justified by a valid factor unrelated to economic protection-

ism . . . ." *New Energy Co. of Ind.* v. *Limbach,* 486 U. S. 269, 273–274 (1988).[9]

The paradigmatic example of a law discriminating against interstate commerce is the protective tariff or customs duty, which taxes goods imported from other States, but does not tax similar products produced in State. A tariff is an attractive measure because it simultaneously raises revenue and benefits local producers by burdening their out-of-state competitors. Nevertheless, it violates the principle of the unitary national market by handicapping out-of-state competitors, thus artificially encouraging in-state production even when the same goods could be produced at lower cost in other States.

Because of their distorting effects on the geography of production, tariffs have long been recognized as violative of the Commerce Clause. In fact, tariffs against the products of other States are so patently unconstitutional that our cases reveal not a single attempt by any State to enact one. Instead, the cases are filled with state laws that aspire to reap some of the benefits of tariffs by other means. In *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511 (1935), the State of New York attempted to protect its dairy farmers from the adverse effects of Vermont competition by establishing a single minimum price for all milk, whether produced in New York or elsewhere. This Court did not hesitate, however, to strike it down. Writing for a unanimous Court, Justice Cardozo reasoned:

---

[9] The "negative" aspect of the Commerce Clause was considered the more important by the "father of the Constitution," James Madison. In one of his letters, Madison wrote that the Commerce Clause "grew out of the abuse of the power by the importing States in taxing the non-importing, and was intended as a negative and preventive provision against injustice among the States themselves, rather than as a power to be used for the positive purposes of the General Government." 3 M. Farrand, Records of the Federal Convention of 1787, p. 478 (1911).

> "Neither the power to tax nor the police power may be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state or the labor of its residents. Restrictions so contrived are an unreasonable clog upon the mobility of commerce. They set up what is equivalent to a rampart of customs duties designed to neutralize advantages belonging to the place of origin." *Id.*, at 527.

Thus, because the minimum price regulation had the same effect as a tariff or customs duty—neutralizing the advantage possessed by lower cost out-of-state producers—it was held unconstitutional. Similarly, in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), this Court invalidated a law which advantaged local production by granting a tax exemption to certain liquors produced in Hawaii. Other cases of this kind are legion. *Welton* v. *Missouri*, 91 U. S. 275 (1876); *Guy* v. *Baltimore*, 100 U. S. 434 (1880); *Toomer* v. *Witsell*, 334 U. S. 385 (1948); *Polar Ice Cream & Creamery Co.* v. *Andrews*, 375 U. S. 361 (1964); *Chemical Waste Management, Inc.* v. *Hunt*, 504 U. S. 334 (1992); see also *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 351 (1977) (invalidating statute, because it "has the effect of stripping away from the Washington apple industry the competitive and economic advantages it has earned").

Under these cases, Massachusetts' pricing order is clearly unconstitutional. Its avowed purpose and its undisputed effect are to enable higher cost Massachusetts dairy farmers to compete with lower cost dairy farmers in other States. The "premium payments" are effectively a tax which makes milk produced out of State more expensive. Although the tax also applies to milk produced in Massachusetts, its effect on Massachusetts producers is entirely (indeed more than) offset by the subsidy provided exclusively to Massachusetts dairy farmers. Like an ordinary tariff, the tax is thus effectively imposed only on out-of-state products. The pricing

order thus allows Massachusetts dairy farmers who produce at higher cost to sell at or below the price charged by lower cost out-of-state producers.[10]   If there were no federal minimum prices for milk, out-of-state producers might still be able to retain their market share by lowering their prices. Nevertheless, out-of-staters' ability to remain competitive by lowering their prices would not immunize a discriminatory measure.   *New Energy Co. of Ind.* v. *Limbach*, 486 U. S., at 275.[11]   In this case, because the Federal Government sets

----

[10] A numerical example may make this effect clearer.   Suppose the federal minimum price is $12/cwt, that out-of-state producers can sell milk profitably at that price, but that in-state producers need a price of $15/cwt in order to break even.   Under the pricing order, the tax or "order premium" will be $1/cwt (one-third the difference between the $15/cwt target price and the $12/cwt federal minimum price).   Assuming the tax generates sufficient funds (which will be the case as long as two-thirds of the milk is produced out of State, which appears to be the case), the Massachusetts farmers will receive a subsidy of $3/cwt.   This subsidy will allow them to lower their prices from $15/cwt to $12/cwt while still breaking even.   Selling at $12/cwt, Massachusetts dairy farmers will now be able to compete with out-of-state producers.   The net effect of the tax and subsidy, like that of a tariff, is to raise the after-tax price paid by the dealers.   If exactly two-thirds of the milk sold in Massachusetts is produced out of State, net prices will rise by $1/cwt.   If out-of-state farmers produce more than two-thirds of the raw milk, the Dairy Equalization Fund will have a surplus, which will be refunded to the milk dealers. This refund will mitigate the price increase, although it will have no effect on the ability of the program to enable higher cost Massachusetts dairy farmers to compete with lower cost out-of-staters.

[11] In *New Energy*, 486 U. S., at 275, we noted: "It is true that in [*Great Atlantic & Pacific Tea Co.* v. *Cottrell*, 424 U. S. 366 (1976),] and *Sporhase* [v. *Nebraska ex rel. Douglas*, 458 U. S. 941 (1982),] the effect of a State's refusal to accept the offered reciprocity was total elimination of all transport of the subject product into or out of the offering State; whereas in the present case the only effect of refusal is that the out-of-state product is placed at a substantial commercial disadvantage through discriminatory tax treatment.   That makes no difference for purposes of Commerce Clause analysis.   In the leading case of *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511 (1935), the New York law excluding out-of-state milk did not impose an absolute ban, but rather allowed importation and sale so long

minimum prices, out-of-state producers may not even have the option of reducing prices in order to retain market share. The Massachusetts pricing order thus will almost certainly "cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market."[12] *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 126, n. 16 (1978). In fact, this effect was the motive behind the promulgation of the pricing order. This effect renders the program unconstitutional, because it, like a tariff, "neutraliz[es] advantages belonging to the place of origin." *Baldwin*, 294 U. S., at 527.

In some ways, the Massachusetts pricing order is most similar to the law at issue in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984). Both involve a broad-based tax on a single kind of good and special provisions for in-state produc-

---

as the initial purchase from the dairy farmer was made at or above the New York State-mandated price. In other words, just as the appellant here, in order to sell its product in Ohio, only has to cut its profits by reducing its sales price below the market price sufficiently to compensate the Ohio purchaser-retailer for the forgone tax credit, so also the milk wholesaler-distributor in *Baldwin*, in order to sell its product in New York, only had to cut its profits by increasing its purchase price above the market price sufficiently to meet the New York-prescribed premium. We viewed the New York law as 'an economic barrier against competition' that was 'equivalent to a rampart of customs duties.' *Id.*, at 527."

[12] That is not to say that the Massachusetts dairy industry may not continue to shrink and that the market share of Massachusetts dairy producers may not continue its fall. It may be the case that Massachusetts producers' costs are so high that, even with the pricing order, many of them will be unable to compete. Nevertheless, the pricing order will certainly allow more Massachusetts dairy farmers to remain in business than would have had the pricing order not been imposed. For Commerce Clause purposes, it does not matter whether the challenged regulation actually increases the market share of local producers or whether it merely mitigates a projected decline. See *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 272 (1984) ("[W]e perceive no principle of Commerce Clause jurisprudence supporting a distinction between thriving and struggling enterprises . . ."); *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S., at 523.

ers. *Bacchus* involved a 20% excise tax on all liquor sales, coupled with an exemption for fruit wine manufactured in Hawaii and for okolehao, a brandy distilled from the root of a shrub indigenous to Hawaii. The Court held that Hawaii's law was unconstitutional because it "had both the purpose and effect of discriminating in favor of local products." *Id.*, at 273. See also *I. M. Darnell & Son Co.* v. *Memphis*, 208 U. S. 113 (1908) (invalidating property tax exemption favoring local manufacturers). By granting a tax exemption for local products, Hawaii in effect created a protective tariff. Goods produced out of State were taxed, but those produced in State were subject to no net tax. It is obvious that the result in *Bacchus* would have been the same if instead of exempting certain Hawaiian liquors from tax, Hawaii had rebated the amount of tax collected from the sale of those liquors. See *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269 (1988) (discriminatory tax credit). And if a discriminatory tax rebate is unconstitutional, Massachusetts' pricing order is surely invalid; for Massachusetts not only rebates to domestic milk producers the tax paid on the sale of Massachusetts milk, but also the tax paid on the sale of milk produced elsewhere.[13] The additional rebate of the tax paid on the sale of milk produced elsewhere in no way reduces the danger to the national market posed by tariff-like barriers, but instead exacerbates the danger by giving domestic producers an additional tool with which to shore up their competitive position.[14]

---

[13] Indeed, it is this aspect of the pricing order which allows it to give Massachusetts farmers a benefit three times as valuable per cwt as the tax (order premium) imposed. See n. 5, *supra.*

[14] One might attempt to distinguish *Bacchus* by noting that the rebate in this case goes not to the entity which pays the tax (milk dealers) but to the dairy farmers themselves. Rebating the taxes directly to producers rather than to the dealers, however, merely reinforces the conclusion that the pricing order will favor local producers. If the taxes were refunded only to the dealers, there might be no impact on interstate commerce,

## III

Respondent advances four arguments against the conclusion that its pricing order imposes an unconstitutional burden on interstate commerce: (A) Because each component of the program—a local subsidy and a nondiscriminatory tax—is valid, the combination of the two is equally valid; (B) The dealers who pay the order premiums (the tax) are not competitors of the farmers who receive disbursements from the Dairy Equalization Fund, so the pricing order is not discriminatory; (C) The pricing order is not protectionist, because the costs of the program are borne only by Massachusetts dealers and consumers, and the benefits are distributed exclusively to Massachusetts farmers; and (D) The order's incidental burden on commerce is justified by the local benefit of saving the dairy industry from collapse. We discuss each of these arguments in turn.

### A

Respondent's principal argument is that, because "the milk order achieves its goals through lawful means," the order as a whole is constitutional. Brief for Respondent 20. He argues that the payments to Massachusetts dairy farmers from the Dairy Equalization Fund are valid, because subsidies are constitutional exercises of state power, and that the order premium which provides money for the fund is valid, because it is a nondiscriminatory tax. Therefore the pricing order is constitutional, because it is merely the combination of two independently lawful regulations. In effect, respondent argues, if the State may impose a valid tax on dealers, it is free to use the proceeds of the tax as it chooses; and

---

because the dealers might not use the funds to increase the price or quantity of milk purchased from Massachusetts dairy farmers. The refund to the dealers might, therefore, result in no advantage to in-state producers. On the other hand, by refunding moneys directly to the dairy farmers, the pricing order ensures that Massachusetts producers will benefit.

if it may independently subsidize its farmers, it is free to finance the subsidy by means of any legitimate tax.

Even granting respondent's assertion that both components of the pricing order would be constitutional standing alone,[15] the pricing order nevertheless must fall. A pure subsidy funded out of general revenue ordinarily imposes no burden on interstate commerce, but merely assists local business. The pricing order in this case, however, is funded principally from taxes on the sale of milk produced in other States.[16] By so funding the subsidy, respondent not only assists local farmers, but burdens interstate commerce. The pricing order thus violates the cardinal principle that a State may not "benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind.* v. *Limbach*, 486 U. S., at 273–274; see also *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S., at 272; *Guy* v. *Baltimore*, 100 U. S., at 443.

More fundamentally, respondent errs in assuming that the constitutionality of the pricing order follows logically from the constitutionality of its component parts. By conjoining

---

[15] We have never squarely confronted the constitutionality of subsidies, and we need not do so now. We have, however, noted that "[d]irect subsidization of domestic industry does not ordinarily run afoul" of the negative Commerce Clause. *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 278 (1988); see also *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 815 (1976) (STEVENS, J., concurring). In addition, it is undisputed that States may try to attract business by creating an environment conducive to economic activity, as by maintaining good roads, sound public education, or low taxes. *Zobel* v. *Williams*, 457 U. S. 55, 67 (1982) (Brennan, J., concurring); *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S., at 271; *Metropolitan Life Ins. Co.* v. *Ward*, 470 U. S. 869, 876–878 (1985).

[16] It is undisputed that an overwhelming majority of the milk sold in Massachusetts is produced elsewhere. Thus, even though the tax is applied evenhandedly to milk produced in State and out of State, most of the tax collected comes from taxes on milk from other States. In addition, the tax on in-state milk, unlike that imposed on out-of-state milk, does not impose any burden on in-state producers, because in-state dairy farmers can be confident that the taxes paid on their milk will be returned to them via the Dairy Equalization Fund.

a tax and a subsidy, Massachusetts has created a program more dangerous to interstate commerce than either part alone. Nondiscriminatory measures, like the evenhanded tax at issue here, are generally upheld, in spite of any adverse effects on interstate commerce, in part because "[t]he existence of major in-state interests adversely affected . . . is a powerful safeguard against legislative abuse." *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 473, n. 17 (1981); see also *Raymond Motor Transp., Inc.* v. *Rice*, 434 U. S. 429, 444, n. 18 (1978) (special deference to state highway regulations because "their burden usually falls on local economic interests as well as other States' economic interests, thus insuring that a State's own political processes will serve as a check against unduly burdensome regulations"); *South Carolina Highway Dept.* v. *Barnwell Brothers, Inc.*, 303 U. S. 177, 187 (1938); *Goldberg* v. *Sweet*, 488 U. S. 252, 266 (1989).[17] However, when a nondiscriminatory tax is coupled with a subsidy to one of the groups hurt by the tax, a State's political processes can no longer be relied upon to prevent legislative abuse, because one of the in-state interests which would otherwise lobby against the tax has been mollified by the subsidy. So, in this case, one would ordinarily have expected at least three groups to lobby against the order premium, which, as a tax, raises the price (and hence lowers demand) for milk: dairy farmers, milk dealers, and consumers. But because the tax was coupled with a subsidy, one of the most powerful of these groups, Massachusetts dairy

---

[17] The same principle is recognized in the conceptually similar field of intergovernmental taxation, where nondiscrimination also plays a central role in setting the boundary between the permissible and the impermissible. *Washington* v. *United States*, 460 U. S. 536, 545 (1983) ("A 'political check' is provided when a state tax falls on a significant group of state citizens who can be counted upon to use their votes to keep the State from raising the tax excessively, and thus placing an unfair burden on the Federal Government"); *South Carolina* v. *Baker*, 485 U. S. 505, 525–526, n. 15 (1988); *United States* v. *County of Fresno*, 429 U. S. 452, 462–464 (1977).

farmers, instead of exerting their influence against the tax, were in fact its primary supporters.[18]

Respondent's argument would require us to analyze separately two parts of an integrated regulation, but we cannot divorce the premium payments from the use to which the payments are put. It is the entire program—not just the contributions to the fund or the distributions from that fund—that simultaneously burdens interstate commerce and discriminates in favor of local producers. The choice of constitutional means—nondiscriminatory tax and local subsidy—cannot guarantee the constitutionality of the program as a whole. New York's minimum price order also used constitutional means—a State's power to regulate prices—but was held unconstitutional because of its deleterious effects. *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511 (1935). Similarly, the law held unconstitutional in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), involved the exercise of Hawaii's undisputed power to tax and to grant tax exemptions.

Our Commerce Clause jurisprudence is not so rigid as to be controlled by the form by which a State erects barriers to commerce. Rather our cases have eschewed formalism for a sensitive, case-by-case analysis of purposes and effects. As the Court declared over 50 years ago: "The commerce clause forbids discrimination, whether forthright or ingenious. In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." *Best & Co.* v. *Maxwell*, 311 U. S. 454, 455–456 (1940); *Maryland* v. *Louisiana*, 451 U. S. 725, 756 (1981);

---

[18] As the Governor's Special Commission Relative to the Establishment of a Dairy Stabilization Fund realized, consumers would be unlikely to organize effectively to oppose the pricing order. The commission's report remarked, "the estimated two cent increase per quart of milk would not be noticed by the consuming public," App. 18, because the price of milk varies so often and for so many reasons that consumers would be unlikely to feel the price increases or to attribute them to the pricing order.

*Exxon Corp.* v. *Governor of Maryland,* 437 U. S., at 147; see also *Guy* v. *Baltimore,* 100 U. S., at 443 (invalidating discriminatory wharfage fees which were "mere expedient or device to accomplish, by indirection, what the State could not accomplish by a direct tax, viz., build up its domestic commerce by means of unequal and oppressive burdens upon the industry and business of other States"); *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S., at 527 ("What is ultimate is the principle that one state in its dealings with another may not put itself in a position of economic isolation. Formulas and catchwords are subordinate to this overmastering requirement"); *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 354 (1951); *New Energy Co. of Ind.* v. *Limbach,* 486 U. S., at 275, 276 (invalidating reciprocal tax credit because it, "in effect, tax[es] a product made by [Indiana] manufacturers at a rate higher than the same product made by Ohio manufacturers").

## B

Respondent also argues that since the Massachusetts milk dealers who pay the order premiums are not competitors of the Massachusetts farmers, the pricing order imposes no discriminatory burden on commerce. Brief for Respondent 28–29. This argument cannot withstand scrutiny. Is it possible to doubt that if Massachusetts imposed a higher sales tax on milk produced in Maine than milk produced in Massachusetts that the tax would be struck down, in spite of the fact that the sales tax was imposed on consumers, and consumers ·do not compete with dairy farmers? For over 150 years, our cases have rightly concluded that the imposition of a differential burden on any part of the stream of commerce—from wholesaler to retailer to consumer—is invalid, because a burden placed at any point will result in a disadvantage to the out-of-state producer. *Brown* v. *Maryland,* 12 Wheat. 419, 444, 448 (1827) ("So, a tax on the occupation of an importer is, in like manner, a tax on importation. It must add to the price of the article, and be paid by the consumer, or by the

importer himself, in like manner as a direct duty on the article itself would be made." "The distinction between a tax on the thing imported, and on the person of the importer, can have no influence on this part of the subject. It is too obvious for controversy, that they interfere equally with the power to regulate commerce"); *I. M. Darnell & Son Co.* v. *Memphis*, 208 U. S. 113 (1908) (differential burden on intermediate stage manufacturer); *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984) (differential burden on wholesaler); *Webber* v. *Virginia*, 103 U. S. 344, 350 (1881) (differential burden on sales agent); *New Energy Co. of Ind.* v. *Limbach*, 486 U. S., at 273–274 (differential burden on retailer).

## C

Respondent also argues that "the operation of the Order disproves any claim of protectionism," because *"only* in-state consumers feel the effect of any retail price increase . . . [and] [t]he dealers themselves . . . have a substantial in-state presence." Brief for Respondent 17 (emphasis in original). This argument, if accepted, would undermine almost every discriminatory tax case. State taxes are ordinarily paid by in-state businesses and consumers, yet if they discriminate against out-of-state products, they are unconstitutional. The idea that a discriminatory tax does not interfere with interstate commerce "merely because the burden of the tax was borne by consumers" in the taxing State was thoroughly repudiated in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S., at 272. The cost of a tariff is also borne primarily by local consumers, yet a tariff is the paradigmatic Commerce Clause violation.

More fundamentally, respondent ignores the fact that Massachusetts dairy farmers are part of an integrated interstate market. As noted *supra*, at 194–196, the purpose and effect of the pricing order are to divert market share to Massachusetts dairy farmers. This diversion necessarily injures the dairy farmers in neighboring States. Further-

more, the Massachusetts order regulates a portion of the same interstate market in milk that is more broadly regulated by a federal milk marketing order which covers most of New England. 7 CFR § 1001.2 (1993). The Massachusetts producers who deliver milk to dealers in that regulated market are participants in the same interstate milk market as the out-of-state producers who sell in the same market and are guaranteed the same minimum blend price by the federal order. The fact that the Massachusetts order imposes assessments only on Massachusetts sales and distributes them only to Massachusetts producers does not exclude either the assessments or the payments from the interstate market. To the extent that those assessments affect the relative volume of Class I milk products sold in the marketing area as compared to other classes of milk products, they necessarily affect the blend price payable even to out-of-state producers who sell only in non-Massachusetts markets.[19] The obvious impact of the order on out-of-state production demonstrates that it is simply wrong to assume that the pricing order burdens only Massachusetts consumers and dealers.

### D

Finally, respondent argues that any incidental burden on interstate commerce "is outweighed by the 'local benefits' of preserving the Massachusetts dairy industry."[20] Brief for

---

[19] On the way changing the demand for Class I milk products changes the blend price for producers in the entire area covered by the marketing order, see n. 1, *supra*.

[20] Among the "local benefits" that respondent identifies is "protecting unique open space and related benefits." Brief for Respondent 40. As the Massachusetts Supreme Judicial Court recognized by relegating the "open space" point to a single footnote, *West Lynn Creamery, Inc.* v. *Commissioner of Dept. of Food and Agriculture*, 415 Mass. 8, 10, n. 6, 611 N. E. 2d 239, 240, n. 6 (1993), the argument that environmental benefits were central and the enhancement of the market share of Massachusetts dairy farmers merely "incidental" turns the pricing order on its head. In addition, even if environmental preservation were the central purpose of

Respondent 42. In a closely related argument, respondent urges that "the purpose of the order, to save an industry from collapse, is not protectionist." *Id.*, at 16. If we were to accept these arguments, we would make a virtue of the vice that the rule against discrimination condemns. Preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits. In *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S., at 272, we explicitly rejected any distinction "between thriving and struggling enterprises." Whether a State is attempting to "'enhance thriving and substantial business enterprises'" or to "'subsidize . . . financially troubled'" ones is irrelevant to Commerce Clause analysis. *Ibid.* With his characteristic eloquence, Justice Cardozo responded to an argument that respondent echoes today:

> "The argument is pressed upon us, however, that the end to be served by the Milk Control Act is something more than the economic welfare of the farmers or of any other class or classes. The end to be served is the maintenance of a regular and adequate supply of pure and wholesome milk, the supply being put in jeopardy when

---

the pricing order, that would not be sufficient to uphold a discriminatory regulation. See *Philadelphia* v. *New Jersey*, 437 U. S. 617, 626–627 (1978). Finally, the suggestion that the collapse of the dairy industry endangers open space is not self-evident. Dairy farms are enclosed by fences, and the decline of farming may well lead to less, rather than more, intensive land use. As one scholar noted: "Many people assume that . . . land lost from agriculture is now in urban uses. It is true that some agricultural land has been urbanized, especially since World War II, but the major portion of the land moving out of agriculture over the years has been abandoned to natural forest growth." J. Foster & W. MacConnell, Agricultural Land Use Change in Massachusetts 1951–1971, p. 5 (Research Bulletin No. 640, Jan. 1977); see also Department of Agriculture, A. Daugherty, Major Uses of Land in the United States: 1987, pp. 4, 13 (Agricultural Economic Rep. No. 643, 1991) (decline in grazing and pasture land offset by increased wilderness, wildlife, and park areas).

the farmers of the state are unable to earn a living income. *Nebbia* v. *New York*, [291 U. S. 502 (1934)] . . . Let such an exception be admitted, and all that a state will have to do in times of stress and strain is to say that its farmers and merchants and workmen must be protected against competition from without, lest they go upon the poor relief lists or perish altogether. To give entrance to that excuse would be to invite a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S., at 522–523.[21]

In a later case, also involving the welfare of Massachusetts dairy farmers,[22] Justice Jackson described the same overriding interest in the free flow of commerce across state lines:

"Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged

---

[21] "This distinction between the power of the State to shelter its people from menaces to their health or safety and from fraud, even when those dangers emanate from interstate commerce, and its lack of power to retard, burden or constrict the flow of such commerce for their economic advantage, is one deeply rooted in both our history and our law." *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 533 (1949); see also *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S., at 272–273.

[22] A surprisingly large number of our Commerce Clause cases arose out of attempts to protect local dairy farmers. *Schollenberger* v. *Pennsylvania*, 171 U. S. 1 (1898); *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511 (1935); *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S., at 539; *Dean Milk Co.* v. *Madison*, 340 U. S. 349, 354 (1951); *Polar Ice Cream & Creamery Co.* v. *Andrews*, 375 U. S. 361 (1964); *Great Atlantic & Pacific Tea Co.* v. *Cottrell*, 424 U. S. 366 (1976). The reasons for the political effectiveness of milk producers are explored in G. Miller, The Industrial Organization of Political Production: A Case Study, 149 J. Institutional & Theoretical Economics 769 (1993).

to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality." *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 539 (1949).

The judgment of the Supreme Judicial Court of Massachusetts is reversed.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

In my view the challenged Massachusetts pricing order is invalid under our negative-Commerce-Clause jurisprudence, for the reasons explained in Part II below. I do not agree with the reasons assigned by the Court, which seem to me, as explained in Part I, a broad expansion of current law. Accordingly, I concur only in the judgment of the Court.

I

The purpose of the negative Commerce Clause, we have often said, is to create a national market. It does not follow from that, however, and we have never held, that every state law which obstructs a national market violates the Commerce Clause. Yet that is what the Court says today. It seems to have canvassed the entire corpus of negative-Commerce-Clause opinions, culled out every free-market snippet of reasoning, and melded them into the sweeping principle that the Constitution is violated by any state law or regulation that "artificially encourag[es] in-state production even when the same goods could be produced at lower cost in other States." *Ante,* at 193. See also *ante,* at 194 (the

law here is unconstitutional because it "neutraliz[es] the advantage possessed by lower cost out-of-state producers"); *ante*, at 195 (price order is unconstitutional because it allows in-state producers "who produce at higher cost to sell at or below the price charged by lower cost out-of-state producers"); *ante*, at 196 (a state program is unconstitutional where it "'neutralizes advantages belonging to the place of origin'") (quoting *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 527 (1935)); *ante*, at 205 ("Preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits").

As the Court seems to appreciate by its eagerness expressly to reserve the question of the constitutionality of subsidies for in-state industry, *ante*, at 199, and n. 15, this expansive view of the Commerce Clause calls into question a wide variety of state laws that have hitherto been thought permissible. It seems to me that a state subsidy would *clearly* be invalid under any formulation of the Court's guiding principle identified above. The Court guardedly asserts that a "pure subsidy funded out of general revenue *ordinarily* imposes no burden on interstate commerce, but merely assists local business," *ante*, at 199 (emphasis added), but under its analysis that must be taken to be true only because most local businesses (*e. g.*, the local hardware store) are not competing with businesses out of State. The Court notes that, in funding this subsidy, Massachusetts has taxed milk produced in other States, and thus "not only assists local farmers, but burdens interstate commerce." *Ibid.* But the same could be said of almost all subsidies funded from general state revenues, which almost invariably include moneys from use taxes on out-of-state products. And even where the funding does not come in any part from taxes on out-of-state goods, "merely assist[ing]" in-state businesses, *ibid.*, unquestionably neutralizes advantages possessed by out-of-state enterprises. Such subsidies, particularly where

they are in the form of cash or (what comes to the same thing) tax forgiveness, are often admitted to have as their purpose—*indeed, are nationally advertised as having as their purpose*—making it more profitable to conduct business in State than elsewhere, *i. e.*, distorting normal market incentives.

The Court's guiding principle also appears to call into question many garden-variety state laws heretofore permissible under the negative Commerce Clause. A state law, for example, which requires, contrary to the industry practice, the use of recyclable packaging materials, favors local non-exporting producers, who do not have to establish an additional, separate packaging operation for in-state sales. If the Court's analysis is to be believed, such a law would be unconstitutional without regard to whether disruption of the "national market" is the real purpose of the restriction, and without the need to "balance" the importance of the state interests thereby pursued, see *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970). These results would greatly extend the negative Commerce Clause beyond its current scope. If the Court does not intend these consequences, and does not want to foster needless litigation concerning them, it should not have adopted its expansive rationale. Another basis for deciding the case is available, which I proceed to discuss.

## II

"The historical record provides no grounds for reading the Commerce Clause to be other than what it says—an authorization for Congress to regulate commerce." *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 263 (1987) (SCALIA, J., concurring in part and dissenting in part). Nonetheless, we formally adopted the doctrine of the negative Commerce Clause 121 years ago, see *Case of the State Freight Tax*, 15 Wall. 232 (1873), and since then have decided a vast number of negative-Commerce-Clause cases, engendering considerable reliance interests.

As a result, I will, on *stare decisis* grounds, enforce a self-executing "negative" Commerce Clause in two situations: (1) against a state law that facially discriminates against interstate commerce, and (2) against a state law that is indistinguishable from a type of law previously held unconstitutional by this Court. See *Itel Containers Int'l Corp.* v. *Huddleston,* 507 U. S. 60, 78–79, and nn. 1, 2 (1993) (SCALIA, J., concurring in judgment) (collecting cases). Applying this approach—or at least the second part of it—is not always easy, since once one gets beyond facial discrimination our negative-Commerce-Clause jurisprudence becomes (and long has been) a "quagmire." *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 458 (1959). See generally D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, pp. 168–181, 222–236, 330–342, 403–416 (1985). The object should be, however, to produce a clear rule that honors the holdings of our past decisions but declines to extend the rationale that produced those decisions any further. See *American Trucking Assns., Inc.* v. *Scheiner,* 483 U. S. 266, 305–306 (1987) (SCALIA, J., dissenting).

There are at least four possible devices that would enable a State to produce the economic effect that Massachusetts has produced here: (1) a discriminatory tax upon the industry, imposing a higher liability on out-of-state members than on their in-state competitors; (2) a tax upon the industry that is nondiscriminatory in its assessment, but that has an "exemption" or "credit" for in-state members; (3) a nondiscriminatory tax upon the industry, the revenues from which are placed into a segregated fund, which fund is disbursed as "rebates" or "subsidies" to in-state members of the industry (the situation at issue in this case); and (4) with or without nondiscriminatory taxation of the industry, a subsidy for the in-state members of the industry, funded from the State's general revenues. It is long settled that the first of these methodologies is unconstitutional under the negative Com-

merce Clause. See, *e. g., Guy* v. *Baltimore*, 100 U. S. 434, 443 (1880). The second of them, "exemption" from or "credit" against a "neutral" tax, is no different in principle from the first, and has likewise been held invalid. See *Maryland* v. *Louisiana*, 451 U. S. 725, 756 (1981); *Westinghouse Elec. Corp.* v. *Tully*, 466 U. S. 388, 399–400, and n. 9 (1984). The fourth methodology, application of a state subsidy from general revenues, is so far removed from what we have hitherto held to be unconstitutional, that prohibiting it must be regarded as an extension of our negative-Commerce-Clause jurisprudence and therefore, to me, unacceptable. See *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 278 (1988). Indeed, in my view our negative-Commerce-Clause cases have already approved the use of such subsidies. See *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 809–810 (1976).

The issue before us in the present case is whether the third of these methodologies must fall. Although the question is close, I conclude it would not be a principled point at which to disembark from the negative-Commerce-Clause train. The only difference between methodology (2) (discriminatory "exemption" from nondiscriminatory tax) and methodology (3) (discriminatory refund of nondiscriminatory tax) is that the money is taken and returned rather than simply left with the favored in-state taxpayer in the first place. The difference between (3) and (4), on the other hand, is the difference between assisting in-state industry through discriminatory taxation and assisting in-state industry by other means.

I would therefore allow a State to subsidize its domestic industry so long as it does so from nondiscriminatory taxes that go into the State's general revenue fund. Perhaps, as some commentators contend, that line comports with an important economic reality: A State is less likely to maintain a subsidy when its citizens perceive that the money (in the general fund) is available for any number of competing,

nonprotectionist, purposes. See Coenen, Untangling the Market-Participant Exemption to the Dormant Commerce Clause, 88 Mich. L. Rev. 395, 479 (1989); Collins, Economic Union as a Constitutional Value, 63 N. Y. U. L. Rev. 43, 103 (1988); Gergen, The Selfish State and the Market, 66 Texas L. Rev. 1097, 1138 (1988); see also *ante*, at 200, and n. 17. That is not, however, the basis for my position, for as THE CHIEF JUSTICE explains, "[a]nalysis of interest group participation in the political process may serve many useful purposes, but serving as a basis for interpreting the dormant Commerce Clause is not one of them." *Post*, at 215 (dissenting opinion). Instead, I draw the line where I do because it is a clear, rational line at the limits of our extant negative-Commerce-Clause jurisprudence.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE BLACKMUN joins, dissenting.

The Court is less than just in its description of the reasons which lay behind the Massachusetts law which it strikes down. The law undoubtedly sought to aid struggling Massachusetts dairy farmers, beset by steady or declining prices and escalating costs. This situation is apparently not unique to Massachusetts; New Jersey has filed an *amicus* brief in support of respondent because New Jersey has enacted a similar law. Both States lie in the northeastern metropolitan corridor, which is the most urbanized area in the United States, and has every prospect of becoming more so. The value of agricultural land located near metropolitan areas is driven up by the demand for housing and similar urban uses; distressed farmers eventually sell out to developers. Not merely farm produce is lost, as is the milk production in this case, but, as the Massachusetts Special Commission whose report was the basis for the order in question here found:

"Without the continued existence of dairy farmers, the Commonwealth will lose its supply of locally produced fresh milk, together with the open lands that are used as

wildlife refuges, for recreation, hunting, fishing, tourism, and education." App. 13.

Massachusetts has dealt with this problem by providing a subsidy to aid its beleaguered dairy farmers. In case after case, we have approved the validity under the Commerce Clause of such enactments. "No one disputes that a State may enact laws pursuant to its police powers that have the purpose and effect of encouraging domestic industry." *Bacchus Imports, Ltd.* v. *Dias,* 468 U. S. 263, 271 (1984). "Direct subsidization of domestic industry does not ordinarily run afoul of [the dormant Commerce Clause]; discriminatory taxation of out-of-state manufacturers does." *New Energy Co. of Ind.* v. *Limbach,* 486 U. S. 269, 278 (1988). But today the Court relegates these well-established principles to a footnote and, at the same time, gratuitously casts doubt on the validity of state subsidies, observing that "[w]e have never squarely confronted" their constitutionality. *Ante,* at 199, n. 15.

But in *Milk Control Bd.* v. *Eisenberg Farm Products,* 306 U. S. 346 (1939), the Court upheld a Pennsylvania statute establishing minimum prices to be paid to Pennsylvania dairy farmers against a Commerce Clause challenge by a Pennsylvania milk dealer that shipped all of its milk purchased in Pennsylvania to New York to be sold there. The Court observed that "[t]he purpose of the statute . . . is to reach a domestic situation in the interest of the welfare of the producers and consumers of milk in Pennsylvania." *Id.,* at 352. It went on to say:

> "One of the commonest forms of state action is the exercise of the police power directed to the control of local conditions and exerted in the interest of the welfare of the state's citizens. Every state police statute necessarily will affect interstate commerce in some degree, but such a statute does not run counter to the grant of Congressional power merely because it incidentally or

indirectly involves or burdens interstate commerce. . . . These principles have guided judicial decision for more than a century." *Id.*, at 351–352.

The Massachusetts subsidy under consideration is similar in many respects to the Pennsylvania statute described in *Eisenberg, supra.* Massachusetts taxes all dealers of milk within its borders. The tax is evenhanded on its face, *i. e.*, it affects all dealers regardless of the point of origin of the milk. *Ante,* at 194 ("the tax also applies to milk produced in Massachusetts"); *ante,* at 200 ("the evenhanded tax at issue here"). The State has not acted to strong-arm sister States as in *Limbach;* rather, its motives are purely local. As the Supreme Judicial Court of Massachusetts aptly described it: "[T]he premiums represent one of the costs of doing business in the Commonwealth, a cost all milk dealers must pay." *West Lynn Creamery, Inc.* v. *Commissioner of Dept. of Food and Agriculture,* 415 Mass. 8, 19, 611 N. E. 2d 239, 245 (1993).

Consistent with precedent, the Court observes: "A pure subsidy funded out of general revenue ordinarily imposes no burden on interstate commerce, but merely assists local business." *Ante,* at 199. And the Court correctly recognizes that "[n]ondiscriminatory measures, like the evenhanded tax at issue here, are generally upheld" due to the deference normally accorded to a State's political process in passing legislation in light of various competing interest groups. *Ante,* at 200, citing *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U. S. 456, 473, n. 17 (1981), and *Raymond Motor Transp., Inc.* v. *Rice,* 434 U. S. 429, 444, n. 18 (1978). But the Court strikes down this method of state subsidization because the nondiscriminatory tax levied against all milk *dealers* is coupled with a subsidy to milk *producers. Ante,* at 200–201. The Court does this because of its view that the method of imposing the tax and subsidy distorts the State's political process: The dairy farmers, who would otherwise lobby against the tax, have been mollified by the subsidy. *Ibid.* But as the Court itself points out, there are still at least two

strong interest groups opposed to the milk order—consumers and milk dealers. More importantly, nothing in the dormant Commerce Clause suggests that the fate of state regulation should turn upon the particular lawful manner in which the state subsidy is enacted or promulgated. Analysis of interest group participation in the political process may serve many useful purposes, but serving as a basis for interpreting the dormant Commerce Clause is not one of them.

The Court concludes that the combined effect of the milk order "simultaneously burdens interstate commerce and discriminates in favor of local producers." *Ante*, at 201. In support of this conclusion, the Court cites *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511 (1935), and *Bacchus Imports, Ltd.* v. *Dias, supra*, as two examples in which constitutional means were held to have unconstitutional effects on interstate commerce. But both *Baldwin* and *Bacchus* are a far cry from this case.

In *Baldwin, supra*, in order to sell bottled milk in New York, milk dealers were required to pay a minimum price for milk, even though they could have purchased milk from Vermont farmers at a lower price. This scheme was found to be an effort to prevent Vermont milk producers from selling to New York dealers at their lower market price. As Justice Cardozo explained, under the New York statute, "the importer . . . may keep his milk or drink it, but sell it he may not." 294 U. S., at 521. Such a scheme clearly made it less attractive for New York dealers to purchase milk from Vermont farmers, for the disputed law negated any economic advantage in so doing. Under the Massachusetts milk order, there is no such adverse effect. Milk dealers have the same incentives to purchase lower priced milk from out-of-state farmers; dealers of all milk are taxed equally. To borrow Justice Cardozo's description, milk dealers in Massachusetts are free to keep their milk, drink their milk, and sell it—on equal terms as local milk.

In *Bacchus,* the State of Hawaii combined its undisputed power to tax and grant exemptions in a manner that the Court found violative of the Commerce Clause. There, the State exempted a local wine from the burdens of an excise tax levied on all other liquor sales. Despite the Court's strained attempt to compare the scheme in *Bacchus* to the milk order in this case, *ante,* at 196–197, it is clear that the milk order does not produce the same effect on interstate commerce as the tax exemption in *Bacchus.* I agree with the Court's statement that *Bacchus* can be distinguished "by noting that the rebate in this case goes not to the entity which pays the tax (milk dealers) but to the dairy farmers themselves." *Ante,* at 197, n. 14. This is not only a distinction, but a significant difference. No decided case supports the Court's conclusion that the negative Commerce Clause prohibits the State from using money that it has lawfully obtained through a neutral tax on milk dealers and distributing it as a subsidy to dairy farmers. Indeed, the case which comes closest to supporting the result the Court reaches is the ill-starred opinion in *United States* v. *Butler,* 297 U. S. 1 (1936), in which the Court held unconstitutional what would have been an otherwise valid tax on the processing of agricultural products because of the use to which the revenue raised by the tax was put.

More than half a century ago, Justice Brandeis said in his dissenting opinion in *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 311 (1932):

> "To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."

Justice Brandeis' statement has been cited more than once in subsequent majority opinions of the Court. See, *e. g.*, *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 441 (1980). His observation bears heeding today, as it did when he made it. The wisdom of a messianic insistence on a grim sink-or-swim policy of laissez-faire economics would be debatable had Congress chosen to enact it; but Congress has done nothing of the kind. It is the Court which has imposed the policy under the dormant Commerce Clause, a policy which bodes ill for the values of federalism which have long animated our constitutional jurisprudence.