Peter A. DORAN and Wendy E. Saunders, individually and on behalf of all others similarly situated, Plaintiffs,

v.

MASSACHUSETTS TURNPIKE AUTHORITY, Matthew Amorello, Christy Mihos, and Jordan Levy, Defendants.

No. CIV. 02–11361–NG.

United States District Court, D. Massachusetts.

Jan. 24, 2003.

Stephen V. Saia, Law Offices of Stephen V. Saia, Pembroke, for Peter A. Doran, individually and on behalf of all others similarly situated, Wendy E. Saunders, individually and on behalf of all others similarly situated, Plaintiffs.

James A. Aloisi, Goulston & Storrs, PC, Piper Rudnick LLP, Donnelly, Conroy & Gelhaar, LLP, Joshua M. Davis, Peter N Kochansky, Goulston & Storrs, Boston, for Massachusetts Turnpike Authority, Matthew Amorello, Christy Mihos, Jordan Levy, Defendants.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

The Massachusetts Turnpike Authority ("MTA") maintains a "FAST LANE" electronic toll collection system that enables subscribing drivers to pass through tollbooths without stopping to pay tolls in cash. A device known as a "transponder" signals to the tollbooth that a particular FAST LANE subscriber has passed through the toll gate, and an appropriate toll is assessed against the driver's FAST LANE account (or debited from his bank account) for billing. Turnpike authorities in other states have adopted similar systems with different brand names, and some of these systems are interoperable with one another. For example, transponders from the EZ–Pass system that governs cash-free access to the New York, New Jersey, and Pennsylvania toll roads will work on Massachusetts' FAST LANE signal detectors, and vice versa.

Plaintiffs Peter A. Doran and Wendy E. Saunders bring a class action complaint under § 1983 against the Massachusetts Turnpike Authority ("MTA") and its individual board members, alleging that the discounts offered by the MTA to FAST LANE subscribers—but not to subscribers of compatible services favored in other states (like EZ–Pass)—violate the dormant commerce clause. The plaintiffs press for a preliminary injunction suspending the discount program, and the defendants have countered with a motion to dismiss the complaint. For the reasons set forth below, the motion to dismiss is **GRANTED**, and the plaintiffs are **DENIED** their preliminary injunction.

## I. FACTS/PROCEDURAL HISTORY

In March 1997, Governor William Weld, signed the Metropolitan Highway Systems ("MHS") bill. Among other provisions, the bill authorized a toll increase at the Allston–Brighton and Route 128 toll plazas from $.50 to $1, at the Ted Williams Tunnel from $2 to $3, and at the Sumner Tunnel from $2 to $3. The revenue from the toll hikes would pay for bonds issued to finance the Central Artery/Third Harbor Tunnel Project, commonly known as the "Big Dig." The project aims to bury a stretch of Interstate 93 ("I–93") beneath the city of Boston and extend Interstate 90 ("I–90") to Logan International Airport. It is the defendants' responsibility to generate through tolls approximately $1.5 billion of the nearly $6 billion required to complete work on the Interstate 90 segment.

The scheduled effective date of the toll increase was January 1, 2002. In November 2001, in response to public opposition, the MTA board of directors postponed the proposed toll hikes to July 1, 2002. Strong and sustained public opposition to the toll hikes also led lawmakers to seek out possible alternatives to funding the Big Dig.

In addition, the defendants agreed to implement a Resident Only Discount Program, discounting the tolls for state residents who drive passenger cars equipped with the FAST LANE electronic toll col-

lection system at the Allston–Brighton and Route 128 interchanges, as well as the Ted Williams and Sumner Tunnels. FAST LANE subscribers would save $.25 at the Allston–Brighton and Route 128 toll plazas, and $.50 at the tunnels.

As I explain in brief above, the FAST LANE system enables drivers to pass through toll plazas without having to stop and pay. Subscribers to the FAST LANE program are issued a "transponder," a small plastic device that mounts on the windshield. As the car passes through a designated FAST LANE toll plaza lane, the transponder signals that car's identity to the MTA, which automatically levies a toll against the driver's credit card or bank account. Drivers must purchase a transponder from FAST LANE to participate in the program. Each transponder costs $27.50. Subscribers can choose from several toll payment options, the most popular of which is to assign the FAST LANE account to a credit card, which is billed $20 to open the account. Thereafter tolls are deducted from the $20 until $10 remains in the account, at which point an additional $10 is billed to the credit card account.

This resident-only FAST LANE discount was to be implemented on July 1, 2002. On July 3 an article in the *Boston Globe* publicized concerns about the discount's constitutionality under the dormant commerce clause of the U.S. Constitution.[1] On or about July 3 the defendants altered the discount program to eliminate the resident-only component of the discount. Defendant Matthew Amorello observed that a few thousand out-of-state FAST LANE subscribers—most of them from Connecticut—would become eligible for discounts.[2]

Plaintiff and Vermont resident Peter A. Doran drove through the Allston–Brighton and Route 128 toll plazas on July 4, 2002 and paid the full toll. Plaintiff and New York resident Wendy E. Saunders, who has an EZ–Pass transponder, drove through the same plazas a day later and did not get the benefit of the transactions.

On August 19, 2002 the plaintiffs filed a motion for a preliminary injunction [document # 5]. The defendants responded with a motion to dismiss [document # 7] and included in their initial opposition to the preliminary injunction motion a request that I defer ruling on the preliminary injunction. The parties appeared to argue their positions on November 6, 2002, and at the hearing I allowed supplemental briefing.

## II. *DISCUSSION*

A complaint is subject to dismissal under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Gorski v. New Hampshire Dep't of Corrections*, 290 F.3d 466, 473 (1st Cir.2002) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). The allegations in the complaint should be accepted as true and all reasonable inferences must be drawn in favor of the plaintiff. *Moss v. Camp Pemigewassett, Inc.*, 312 F.3d 503, 506 (1st Cir.2002); *Aybar v. Crispin–Reyes*, 118 F.3d 10, 13 (1st Cir.1997).

It is the plaintiffs' position that I should rule on their preliminary injunction motion first. But the dismissal standard—wheth-

---

1. The dormant commerce clause, as I will explain more fully below, impresses upon the several states a duty to refrain from enacting policies that discriminate against commercial interests in other states or otherwise unduly burden commerce among the states.

2. Defendants Amorello, Christy Mihos, and Jordan Levy are board members of the Turnpike Authority.

er the complaint states a claim for which relief can be granted—is a logical precondition for establishing a likelihood of success on the merits of the claim. It seems appropriate and economical, then, to begin with the issues raised in the defendants' motion to dismiss. *See Ecological Sys. Technology v. Aquatic Wildlife,* 142 F.Supp.2d 122, 126 (D.Mass.2000) (denying as moot a motion for preliminary injunction following the dismissal of claims against the only remaining defendant); *see also Mangieri v. Mangieri,* 226 F.3d 1, 2–3 (1st Cir.2000) (noting, while affirming the district court's dismissal of claims, its denial of a preliminary injunction).

### A. Motion to Dismiss

The Commerce Clause of the United States Constitution affords Congress the authority to "regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has long recognized a negative or "dormant" provision of the Commerce Clause, and well-entrenched law recognizes a constitutional principle arising from the Commerce Clause that the individual states (and their localities) have a limited capacity to exert their will upon interstate commerce. *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.,* 520 U.S. 564, 571–72, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997).

A dormant commerce clause inquiry is best performed in three parts. The first question is whether the FAST LANE discount has an extraterritorial reach, that is, does it regulate activity conducted entirely beyond the state's borders, which is *per se* unlawful? *See Pharmaceutical Research & Mfrs. of Am. v. Concannon,* 249 F.3d 66, 79 (1st Cir.2001). I conclude that it does not. The second question is whether the regulation affirmatively or clearly discrimi-

nates against interstate commerce on its face or in its "practical effect." *Id.* In that case the regulation would be impermissible unless the defendants could meet a substantial test—whether the discrimination is demonstrably justified by a valid factor unrelated to protectionism. I conclude that the FAST LANE discount does not fit into this category at all. Finally, the third question is whether a regulation that is not facially discriminatory (the second category above) incidentally burdens interstate commerce. Such a regulation would be impermissible unless the defendant passed a somewhat less strict balancing test—whether the burden on interstate trade is clearly excessive in relation to the local benefits. *See Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

### 1. Does the FAST LANE Discount Have an Extraterritorial Reach?

A state statute or practice has an extraterritorial reach when it purports to regulate activity conducted entirely beyond the state's borders or has the practical effect of subjecting out-of-state conduct to its terms. *Concannon,* 249 F.3d at 79. The discount offer relates to highway tolls paid within Massachusetts for travel on Massachusetts toll roads. I do not find the program to have an extraterritorial reach.

### 2. Does the FAST LANE Discount Discriminate between Residents of Massachusetts and Out–of–Staters?

Both parties recognize that a state policy that discriminates[3] between in-state

---

**3.** There is no art or nuance to the term dis-

crimination in the dormant commerce clause

and out-of-state interests is "virtually *per se* invalid." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of the State of Oregon,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *see also C & A Carbone, Inc. v. Town of Clarkstown, N.Y.,* 511 U.S. 383, 391–92, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (citing a list of cases invalidating laws requiring that goods be processed in-state before export). The "virtually" qualifier reflects the Court's determination that discriminatory policies are passable when they serve a legitimate local purpose and no nondiscriminatory means would achieve the same end. *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986); *cf. also Utility Contractors Ass'n of New England v. City of Worcester,* 236 F.Supp.2d 113, 2002 WL 31892919, at *4 (D.Mass. Dec.23, 2002) (noting that policies charged as discriminatory under the Privileges and Immunities Clause are valid when there is a "substantial reason" for them and less restrictive means are unavailable).

The parties do not confront the threshold question whether the dormant commerce clause might apply to an affirmative discount awarded discriminatorily (as opposed to a more direct regulatory constraint on action). That issue is well-settled in the plaintiffs' favor. In *West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994), the Court made the point that while an even-handed tax does not implicate the dormant commerce clause, "when a nondiscriminatory tax is coupled with a subsidy to [in-staters] hurt by the tax" with the result that "the tax is effectively imposed only on out-of-state products," the scheme is discriminatory. *Id.* at 194, 200, 114 S.Ct. 2205. The Court's reasoning in *West*

*Lynn Creamery* easily translates to the present case: the availability of discounts to FAST LANE subscribers effectively places the burden of the toll increase upon nonsubscribers. As a result, if the plaintiffs can prove that the discount policy discriminates against out-of-state drivers, the MTA will not escape liability merely by describing the toll discount as a subsidy.

### a. *Facial Discrimination*

The plaintiff argues that the discount program is facially discriminatory because the discount plan sets up an "Out of State Toll Gate." The cases that Doran cites— *Oregon Waste Sys.,* 511 U.S. at 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994), *Chem. Waste Management, Inc. v. Hunt,* 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992); *Boston Stock Exchange v. State Tax Comm'n,* 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977)—all invalidated schemes that drew express distinctions between in-state and out-of-state interests and gave the in-staters more favorable treatment.

The distinction drawn on the face of the discount scheme is between FAST LANE subscribers and nonsubscribers, not between Massachusetts residents and out-of-staters. Accordingly, the more pertinent analysis in the *per se* violation inquiry is whether the scheme discriminates in its "practical effect."

### b. *Discrimination in Practical Effect*

It is the view of the Supreme Court that a state or locality ought not avoid *per se* liability under the dormant commerce clause for schemes that do not discriminate on their face, but more artfully achieve a preference for in-staters via pre-

---

context. The Supreme Court observes that the term "simply means differential treatment of in-state and out-of-state economic interests

that benefits the former and burdens the latter." *Oregon Waste Sys.,* 511 U.S. at 99, 114 S.Ct. 1345.

textual distinctions. *West Lynn Creamery*, 512 U.S. at 201, 114 S.Ct. 2205 ("[O]ur cases have eschewed formalism for a sensitive, case-by-case analysis of purposes and effects." As the Court declared over 50 years ago: " 'The commerce clause forbids discrimination, whether forthright or ingenious.' " (quoting *Best & Co. v. Maxwell*, 311 U.S. 454, 455–56, 61 S.Ct. 334, 85 L.Ed. 275 (1940))).

■ A fair analysis of the "practical effect" of the discount program, in my mind, finds that it confronts would-be subscribers with an economic decision. FAST LANE requires its subscribers to post a $27.50 deposit for its transponders and open an account with a minimum balance of $10, whereas other electronic toll collection services—EZ-Pass, for one—provide transponders to drivers at no charge. The result is that drivers will enroll in FAST LANE to take advantage of the discount only when they travel toll roads frequently enough that the transponder would "pay for itself." Facially, then, the discount plan favors FAST LANE subscribers over non-FAST LANE subscribers, and in its practical effect it favors those who frequent the toll roads over occasional travelers.

The upshot of that economic analysis, in the plaintiffs' view, is that Massachusetts residents as a class are indirectly favored, because they are more likely to avail themselves repeatedly of the toll roads within their state. As the plaintiffs point out, nonresidents "will be unable to recoup the investment in the transponder and the prepaid toll minimum balance because they may not travel enough to the forum state." But it is not the case that an out-of-state driver will *necessarily* favor the cost-free alternative; an out-of-state resident could well travel Massachusetts' toll roads often enough that he makes up for his initial expenditure in toll discounts. More im-

portantly, nothing in the MTA's discount plan or other regulations precludes out-of-staters from driving the Massachusetts toll roads with that frequency.

The crucial issue here is whether the fact that there is no perfect congruence between FAST LANE membership and residency status precludes any charge of discrimination, facial or practical. The parties do not expressly argue that point, though their positions hint at different assumptions on the law. The plaintiffs' view seems to be that though a scheme may not be drawn to distinguish perfectly between interests inside and outside a state, at a certain point the numbers of harmed in-staters and unharmed out-of-staters becomes so small that the scheme must be held discriminatory in its practical effect.

It is my view that at a bare minimum (that is, whether or not it prefers in-staters as group), the challenged practice must disfavor out-of-staters as a group, and the Supreme Court's language and holdings bear that out. That is, the reference to "practical effect," when the Court considers whether a regulation affirmatively discriminates against interstate transportation on its face or in its practical effect, *C & A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383, 394, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); *see also id.* at 402, 114 S.Ct. 1677 (O'Connor, J., concurring), does not open the door to a disparate impact analysis, as that is understood in other settings. A discrimination analysis under the dormant commerce clause, rather, is triggered by the wholesale exclusion of out-of-staters from the regulation as a group either directly or through pretext or subterfuge. *See, e.g., Maryland v. Louisiana*, 451 U.S. 725, 734, 757–58, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981) (finding a First–Use Tax on natural gas discriminatory in practical effect where "Louisiana consumers of OCS are

for the most part not burdened by the tax, but it does uniformly apply to gas moving out of the State"). In contrast, the exclusion of some percentage of out-of-staters, but not all of them, does not fit within the "discrimination" test, although it may be evaluated under the "excessively burden" test.

In the *C & A Carbone* case, the Court confronted a municipal ordinance requiring all nonhazardous solid waste in Clarkstown to be deposited at a single transfer station in the town. *Id.* at 387–88, 114 S.Ct. 1677. The Court found the ordinance to be discriminatory, "for it allows only the favored operator to process waste that is within the limits of the town," so depriving out-of-state waste processors of an in-state market. *Id.* at 391, 114 S.Ct. 1677. The fact that all in-state processors but one suffered from the ordinance as well did not change the result. *Id.* ("The ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition.").

Justice O'Connor concurred in the result but dissented from the Court's finding that the regulation at issue was "discriminatory" under the Court's dormant commerce clause jurisprudence. She concluded that it was not, but that it did "excessively burden" interstate commerce under the third test. *Id.* at 405, 407, 114 S.Ct. 1677 (O'Connor, J., concurring).

Significantly, the debate between the court majority and Justice O'Connor focused on the impact of the regulation on in-staters—whether the scheme must at least favor the interests of an entire locality in the state, be it a city or a county, as Justice O'Connor concluded—or whether it is enough that all in-staters but one are disadvantaged. (Justice O'Connor would require that the scheme favor a locality of some sort on the ground that "the fact that interests within the regulating jurisdiction are equally affected by the challenged enactment counsels against a finding of discrimination," as one would expect those interests to contest the regulation. *Id.* at 404, 114 S.Ct. 1677.) Neither Justice O'Connor nor the majority, however, would extend the definition of "discriminatory" to include the present case where not all out-of-state residents are burdened.

■ The FAST LANE discount, unlike the provision at issue in *C & A Carbone*, does not exclude out-of-state drivers as a group. Out-of-state drivers are able to avail themselves of the discount by subscribing to the FAST LANE program, and it is not inconceivable that some of them will. Because out-of-state drivers in whatever number can partake of the toll discounts, I cannot hold that the discount program is discriminatory in its practical effect. *See Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 716–17, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972) (finding airport taxes nondiscriminatory because "[w]hile the vast majority of passengers who board flights at the airports involved are traveling interstate, both interstate and intrastate flights are subject to the same charges").[4]

---

**4.** As I have noted, the dormant commerce clause ban on discrimination, unlike its counterparts in the civil rights statutes, *see, e.g., Langlois v. Abington Housing Authority*, 234 F.Supp.2d 33, 2002 WL 31681317, at *16 (D.Mass. Nov.27, 2002), does not accommodate a "disparate impact" analysis. That is, a plaintiff may not establish that a policy is discriminatory and therefore "virtually *per se* invalid" under the dormant commerce clause by showing that the policy disproportionately harms out-of-state interests more than in-state interests. If a policy disfavors out-of-state interests as a group, without exception, it is discriminatory and subject to strict scrutiny under the dormant commerce clause. If it does not disfavor nonresidents as a class but is shown to harm out-of-state interests more

### 3. Does the FAST LANE Discount Excessively Burden Interstate Commerce?

■ It is not to be denied that out-of-state drivers are less likely to pay Massachusetts tolls regularly enough to make a FAST LANE membership profitable. Massachusetts residents will almost certainly benefit from the discount program in greater numbers than out-of-state drivers will, with the result that the FAST LANE discount, while not discriminatory, affects interstate commerce. It remains to consider, under a less exacting standard, whether that burden is *excessive*.

This analysis entails a balancing test: "nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Oregon Waste Sys.*, 511 U.S. at 99, 114 S.Ct. 1345 (quoting *Pike*, 397 U.S. at 142, 90 S.Ct. 844). After reviewing the deferential case law on highway tolls and examining the implications of the FAST LANE discount, I find that the burden the FAST LANE discount imposes on interstate commerce—if any—is negligible. Cast against the local benefit the defendants have identified, a more equitable distribution of toll burdens *within* the state, the burden on interstate commerce is far from excessive.

It is well-settled that a highway toll does not burden interstate commerce if it is reasonable. In fact, the Supreme Court has held and repeated that

> [W]here a state at its own expense furnishes special facilities for the use of those engaged in commerce, interstate as well as domestic, it may exact com-

pensation therefor. The amount of the charges and the method of collection are primarily for determination by the state itself; and so long as they are reasonable and are fixed according to some uniform, fair, and practical standard, they constitute no burden on interstate commerce.

*Evansville–Vanderburgh Airport*, 405 U.S. at 712–13, 92 S.Ct. 1349 (quoting *Hendrick v. Maryland*, 235 U.S. 610, 624, 35 S.Ct. 140, 59 L.Ed. 385 (1915)) (alterations in original). State-maintained highways affirmatively facilitate interstate commerce and travel. Accordingly, toll regimes designed to defray the costs of these facilities must therefore be discriminatorily implemented or "arbitrary or unreasonable" in their amounts, so burdening interstate commerce, to run afoul of the dormant commerce clause. *Id.* at 712–13, 92 S.Ct. 1349. I have already held that the toll scheme in this case is not discriminatory. I now assess whether the MTA's imposition of a FAST LANE discount is so unreasonable as to burden interstate commerce.

The *Evansville* Court's survey of the case law concluded that a scheme that levies tolls according to some rational measurement of drivers' use of the highways will not burden interstate commerce:

> While the Court has invalidated as wholly unrelated to road use a toll based on the carrier's seating capacity and the amount of gasoline over 20 gallons in the carrier's gas tank, we have sustained numerous tolls based on a variety of measures of actual use, including: horsepower, number and capacity of vehicles, mileage within the State, gross-ton mileage, carrying capacity, and manufacturer's rated capacity and weight of trailers.

than in-state interests, the policy is properly reviewed under a more lenient standard:

does it burden interstate commerce *excessively?*

*Id.* at 715, 92 S.Ct. 1349 (citations omitted). The Massachusetts highway toll scheme, like those approved by the Court above, is use-based and so does not in itself burden interstate commerce. Because of the FAST LANE discount program—which is profitable only to frequent users of the toll roads—the toll scheme is more loosely tailored to measured use than it might otherwise be. That is, those who frequently drive the I–90 Boston Turnpike extension will subscribe to FAST LANE and get the discount. The toll is still assessed on a per-use basis, but frequent drivers enjoy a *lower* per-use rate because they travel the toll roads *more often.*

It is clear that because the roads themselves facilitate interstate commerce, courts are not to give exacting scrutiny to the assessments of tolls that maintain them. The case law, however, does not address the question whether a highway toll scheme, otherwise rationally crafted to reflect drivers' use of state facilities, burdens interstate commerce by tacking on discounts to frequent travelers. The Supreme Court's ruling in *Capitol Greyhound Lines v. Brice,* 339 U.S. 542, 70 S.Ct. 806, 94 L.Ed. 1053 (1950), is instructive here. The scheme at issue in *Brice* taxed common carriers in exchange for registration privileges to transport passengers on Maryland's roads. Maryland's scheme combined a per-mile tax assessment with an initial assessment of 2% of the fair market value of the vehicle. The plaintiffs challenged the 2% provision, arguing that the assessment "varies for each carrier without relation to road use." *Id.* at 545, 70 S.Ct. 806. The *Brice* Court nonetheless upheld the 2% assessment, observing that the tax was actionable only as applied, that is, if the ultimate amount owed by a given driver was unreasonable. *Id.* at 547–48, 70 S.Ct. 806.

The issue raised by the FAST LANE discount is similar to that before the Court in *Brice.* The 2% component of Maryland's scheme bore no direct relation to the assessed vehicle's use of Maryland's roads. Likewise, the FAST LANE discount is not directly related to use—the amount owed for use differs based on whether or not the driver has elected to purchase a transponder. If anything, the discount affects toll assessments in *inverse* proportion to use. The more a driver uses the roads, the more likely he is to subscribe to FAST LANE and thus get the discount. Nonetheless, both in *Brice* and in this case, the challenged components work in conjunction with a larger context of toll assessment that is tied to use. Drivers in Massachusetts pay different tolls depending on the distance traveled on the Turnpike, and they pay a fixed fee every time they use a tolled bridge or tunnel. The layering of discounts not directly correlated with use on top of this scheme does not, under *Brice,* make it unconstitutional. The plaintiffs do not dispute this; nor do they argue in the direction that the case law directs them: that the tolls owed on the MTA's highways are so unreasonably high as to burden interstate commerce.

The plaintiffs instead argue that the FAST LANE discounts burden interstate commerce because in-state drivers will make disproportionate use of them. This argument is in fact closely tied to their argument that the discount scheme is discriminatory. They argue that the discount, tied as it is to frequent use of particular toll roads inside the Commonwealth, rewards and encourages intrastate transit at the expense of interstate travelers who must pick up the "slack" in financing the Big Dig.

It is a fact that, while not actually discriminatory, in-state drivers will be much

more likely than out-of-staters to purchase a FAST LANE transponder to get the ensuing discount. However, the severity of this result, which certainly does inhibit interstate commerce, depends upon the degree to which in-staters are more likely than out-of-staters to frequent the toll roads on which the discount the offered. This raises a countervailing consideration: if disproportionately few out-of-staters get the discount, it is because the traffic on the toll roads tends to be disproportionately intrastate traffic. And if the traffic on the toll roads is disproportionately comprised of in-staters traveling to in-state destinations, the comparative disadvantage to out-of-staters has a negligible impact on interstate commerce. As the disadvantage to out-of-state drivers grows, the impact of that disadvantage on out-of-staters as a group decreases.

For example, it might be that so few out-of-state drivers frequent Massachusetts's discounted toll roads that only a minuscule percentage of the out-of-staters find it worthwhile to purchase the FAST LANE transponder, as against a much larger proportion of Massachusetts drivers. Under these conditions the gap between in-staters and out-of-staters in profitability of the discount is dramatic, and out-of-state drivers suffer as a group. But this result obtains precisely because out-of-state drivers as a group avail themselves of the toll roads so rarely. The injury to out-of-state interests—and interstate commerce—occurs on a small scale because those "interests" are minimal.

Plain logic therefore compels me to find that the FAST LANE discount's subsidy to frequent travelers has a negligible effect on interstate commerce. For that matter, it is important to calculate into the analysis the two ways in which the FAST LANE discount *facilitates* interstate commerce. First, the discount rewards repeated and regular use by all drivers of the roads that feed into the stream of commerce, and, second, it makes use of these roads cheaper for a number of travelers.

But I am not to assess solely whether the discount plan burdens interstate commerce; the question before me under the case law is whether the discounts *excessively* burden interstate commerce in relation to the *local benefits* they convey. *Oregon Waste Sys.*, 511 U.S. at 99, 114 S.Ct. 1345 (quoting *Pike*, 397 U.S. at 142, 90 S.Ct. 844). The benefit that the defendants identify is a more equitable distribution of the toll burdens that support its highway projects, including the Big Dig. For example, due to the happenstance of existing tollbooths' location on I–90, east-west commuters on that road are assessed tolls twice daily, whereas other commuters pay nothing on their drives to and from work. Moreover, the Big Dig project has required these commuters to pay still greater tolls for the ultimate benefit of drivers who take I–93 in and out of Boston from points north and south. Although the plaintiffs rightly argue that favoring in-state drivers over out-of-state drivers is not legally cognizable as a "local benefit" in this analysis, preferring regular drivers of the toll roads over infrequent drivers does confer a cognizable benefit.

Assessed against the local benefits it provides, the FAST LANE discount program does not excessively burden interstate commerce. In fact, because the discounts in some ways facilitate and encourage the use of Massachusetts' highways, which in turn benefits interstate commerce, it is not clear that, in aggregate, they burden interstate commerce at all. In light of this analysis and the measure of deference the case law gives to toll assessment schemes, I find that the MTA's practice passes this third and

final test under the dormant commerce clause.

### III. *CONCLUSION*

As the challenged discounts to FAST LANE subscribers have no extraterritorial reach, do not discriminate against out-of-state interests, and do not excessively burden interstate commerce, I **GRANT** the defendants' motion to dismiss and **DENY AS MOOT** the plaintiffs' motion for a preliminary injunction.

**SO ORDERED.**