**CUMBERLAND FARMS, INC.,**
Plaintiff, Appellant,

v.

**TAX ASSESSOR, STATE OF MAINE,**
and Treasurer, State of Maine,
Defendants, Appellees.

No. 96–2353.

United States Court of Appeals,
First Circuit.

Heard April 10, 1997.

Decided June 20, 1997.

Sheldon A. Weiss with whom Joel C. Martin, James B. Haddow, and Petruccelli & Martin were on brief, for plaintiff, appellant.

Janet M. McClintock, Assistant Attorney General, State of Maine, with whom Andrew Ketterer, Attorney General, Lucinda E. White, Assistant Attorney General, and Thomas D. Warren, State Solicitor, were on brief, for defendants, appellees.

Before TORRUELLA, Chief Judge,
SELYA, Circuit Judge, and SARIS,* District Judge.

SELYA, Circuit Judge.

Plaintiff-appellant Cumberland Farms, Inc. ("CFI"), a Massachusetts-based processor and distributor of milk, operates a chain of convenience stores throughout the northeastern states. In this case, it asserts that a milk handling surcharge imposed by the State of Maine violates the Commerce Clause. The defendants are state officials, sued as such (collectively, "Maine" or "the State"). In their view, the milk handling surcharge is indistinguishable for Commerce Clause purposes from a sales tax and does not discriminate against interstate commerce either on its face or in its purpose and effect.

---

* Of the District of Massachusetts, sitting by designation.

Because the Tax Injunction Act, 28 U.S.C. § 1341 (1994), deprives the federal courts (other than the Supreme Court) of jurisdiction to decide the merits of this difficult (and interesting) question, we vacate the judgment below and remand with instructions to dismiss the case.

## I.

### Background

Our tale begins with the Maine Dairy Farm Stabilization Act ("the DFS Act"), Me. Rev.Stat. Ann. tit. 36, §§ 4541–4547 (repealed 1995). The DFS Act had two components. On the one hand, it imposed a tax on packaged fluid milk sold in Maine (whether produced in or out of state). On the other hand, it provided a rebate of the funds so collected to in-state dairy farmers. The first handler in Maine bore the obligation of collecting and paying the tax, regardless of whether such first handler was a wholesaler or a retailer selling milk packaged out of state. *See id.* at 4543(1).

The tax imposed by the DFS Act had an unusual structure, better suited to price maintenance than to revenue augmentation. The amount of the tax varied between 0¢ and 5¢ per quart of milk and increased as the "basic price" of milk fell below the target price of $16.00 per hundredweight (later changed to $16.50 per hundredweight).[1] *See id.* at § 4543(2). The statute directed the State Treasurer to segregate the proceeds from this tax and distribute 94% of the funds so collected to in-state dairy farmers in proportion to their milk production. *See id.* at § 4544(2)(A). This tax-and-subsidy scheme enabled in-state milk producers to receive the target price for their milk come what may—first, they received the basic price from their customers, and then they received the difference between the target price and the basic price as a rebate from the State— and thus shielded them from out-of-state competition.

The Supreme Court threw a monkey wrench into the gears of the DFS Act when it decided *West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). In that case, the Court addressed a Massachusetts pricing order which was tailored to serve substantially the same ends as the DFS Act. The order imposed an assessment on fluid milk sold by Massachusetts retailers and directed distribution of the amounts collected to Massachusetts dairy farmers. *See id.* at 190–91, 114 S.Ct. at 2209–10. Finding that the order's purpose and effect were "to enable higher cost Massachusetts dairy farmers to compete with lower cost dairy farmers in other States," the Court declared the arrangement "clearly unconstitutional." *Id.* at 194, 114 S.Ct. at 2211–12.

In the aftermath of *West Lynn Creamery,* we considered CFI's constitutional challenge to the DFS Act. Finding no significant constitutional distinction between that Act and the Massachusetts law invalidated in *West Lynn Creamery,* we struck down Maine's scheme. *See Cumberland Farms, Inc. v. LaFaver,* 33 F.3d 1 (1st Cir.1994) (per curiam) (*Cumberland I* ).

The Maine legislature responded with remarkable alacrity. In January of 1995, it enacted "An Act to Continue the Fee on the Handling of Milk," Me.Rev.Stat. Ann. tit. 36, §§ 4771–4773 ("the 1995 Act"). The preamble to the legislation recited that "the State and its citizens are experiencing economic difficulties and significant fiscal problems" such that "revenues are necessary to the State's ability to address such difficulties and problems." 1995 Me. Laws ch. 2, Emergen-

---

1. In this context, "basic price" is a term of art. *See* Me.Rev.Stat. Ann. tit. 7, § 2954. The Maine Milk Commission sets the basic price of milk, which is the minimum price that must be paid by milk dealers in Maine (other than those who are federally regulated) to Maine dairy farmers. The basic price is geared to the price of milk established for the Boston zone under the New England Federal Milk Marketing Order No. 1. *See* 7 C.F.R. § 1001 *et seq.* (1997). The DFS Act provided that when the basic price was $16.00 or more per hundredweight (cwt), a handler paid no tax. When the basic price was $15.50 to $15.99 per cwt, the handler paid a tax of 1¢ per quart. When the basic price was $15.00 to $15.49 per cwt, the tax rose to 2¢ per quart, and so on. Since there are about 46.5 quarts of milk per cwt, this mechanism tended to guarantee price stability by keeping the sum of the basic price plus the tax in the vicinity of $16.00 per cwt.

cy Preamble. The 1995 Act assesses a surcharge on milk handlers that is nearly identical to that previously mandated by the DFS Act[2] but directs that the revenues generated are to be deposited into Maine's general fund. *See* Me.Rev.Stat. Ann. tit. 36, § 4772(8).

Shortly after the effective date of the 1995 Act, the plot thickened. The state legislature began systematically to ensure continued subsidization of Maine's dairy farmers. As part of three successive omnibus spending bills for state government, the legislature appropriated to in-state milk producers $1,500,000 for the period March 1995 to June 1996, $4,050,000 for the period July to September 1996, and $3,150,000 for the period July 1996 to June 1997. *See* 1995 Me. Laws ch. 5, § A–1; *id.* at ch. 368, § B–1; *id.* at ch. 665, § KK–1.

CFI believed that this legislative patchwork was a thinly-veiled contrivance aimed at circumventing the decision in *Cumberland I* and that the new legislation, taken in its entirety, shared the same constitutional infirmity which led to the demise of the DFS Act. Consequently, it brought suit in the federal district court seeking injunctive, declaratory, and monetary relief. In due season, the district court rejected CFI's plaint. Although the court believed that the state legislature, in passing the 1995 legislative package (that is, the 1995 Act and the ensuing appropriation bills), "intended to circumvent the Court's decision in *West Lynn Creamery* by simply pulling apart the two components of the [DFS] Act," it nonetheless felt compelled to unwrap the package and analyze each piece of legislation separately. *Cumberland Farms, Inc. v. Mahany,* 943 F.Supp. 83, 87 (D.Me.1996). The court concluded that, when examined independently, both the revenue-raising and spending bills passed muster under the Commerce Clause. *See id.* at 88–90. Accordingly, it granted summary judgment in Maine's favor. This appeal followed.

*II.*

*Analysis*

Federal courts are courts of limited jurisdiction, and thus must take pains to act only within the margins of that jurisdiction. *See National Ass'n of Social Workers v. Harwood,* 69 F.3d 622, 628 n. 6 (1st Cir. 1995). Here, Maine interposes the Tax Injunction Act, 28 U.S.C. § 1341 ("the TIA"), as a defense to CFI's suit. Although Maine did not raise this point below, the TIA's commands are jurisdictional in nature and are not subject to waiver. *See Trailer Marine Transp. Corp. v. Rivera Vazquez,* 977 F.2d 1, 5 (1st Cir.1992). Thus, we start—and finish—our analysis by discussing this facet of the State's defense.

The TIA provides in relevant part that "[t]he district courts shall not enjoin, suspend, or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. In one respect, the TIA sweeps more broadly than the letter of its text suggests. As authoritatively construed, the TIA forbids not only injunctive relief, but also declaratory and monetary relief. *See National Private Truck Council, Inc. v. Oklahoma Tax Comm'n,* 515 U.S. 582, ——, 115 S.Ct. 2351, 2354, 132 L.Ed.2d 509 (1995). Hence, the TIA, if it applies in this instance, is a complete bar to maintaining the instant action in a federal forum. We turn, then, to the question of its applicability.

Two conditions must be satisfied before the TIA will deprive a federal court of jurisdiction: first, the challenged impost must constitute a tax; and second, the State must furnish an adequate alternative to a federal-court remedy. Here, we are concerned only with the first condition, for CFI does not dispute that Maine affords a plain, speedy, and efficient anodyne to persons pu-

---

**2.** The 1995 Act imposes a surcharge that ranges between 0¢ and 6¢ per quart of milk. When the basic price is $16.50 per cwt or more, there is no charge. When the basic price is $16.00 to $16.49 per cwt, the charge is 1¢ per quart. This pattern continues until the basic price drops below $14.00 per cwt, at which point the maximum surcharge (6¢ per quart) is achieved. Me.Rev. Stat. Ann. tit. 36, § 4772(2).

tatively aggrieved by the operation of the 1995 Act.[3]

The question is whether, for purposes of the TIA, Maine's milk handling surcharge is a tax (which would defeat the exercise of federal jurisdiction) or a fee (which would allow the exercise of federal jurisdiction). In *San Juan Cellular Tel. Co. v. Public Serv. Comm'n*, 967 F.2d 683 (1st Cir.1992), we set forth the standard that guides our analysis of this issue. There, after surveying the case law, we stated that:

> [Courts] have sketched a spectrum with a paradigmatic tax at one end and a paradigmatic fee at the other. The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community. The classic "regulatory fee" is imposed by an agency upon those subject to its regulation. It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. Or it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses.
>
> Courts facing cases that lie near the middle of this spectrum have tended ... to emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays [an] agency's cost of regulation.

*Id.* at 685 (citations omitted). This formulation for distinguishing taxes from fees has found favor with a number of other appellate courts. *See, e.g., Bidart Bros. v. California Apple Comm'n*, 73 F.3d 925, 930 (9th Cir. 1996); *Hager v. City of W. Peoria*, 84 F.3d 865, 870 (7th Cir.1996); *Travelers Ins. Co. v. Cuomo*, 14 F.3d 708, 713 (2d Cir.1994). We adhere to it today.

The classification of an impost for purposes of the TIA—"tax" versus "fee"—presents a question of law appropriate for resolution on a properly developed summary judgment record. *See In re Varrasso*, 37 F.3d 760, 763 (1st Cir.1994). Our task, then, is to apply the *San Juan Cellular* standard. The fact that the milk handling surcharge was imposed by the state legislature rather than by an administrative agency suggests that it is a tax rather than a fee. *See Bidart Bros.*, 73 F.3d at 931; *San Juan Cellular*, 967 F.2d at 685. The fact that the revenues raised from the surcharge go into Maine's general fund and are thus spent for the benefit of the citizenry as a whole also favors a finding that the milk handling surcharge is a tax. *See Travelers Ins.*, 14 F.3d at 713; *San Juan Cellular*, 967 F.2d at 685.

There is more. The fact that the responsibility for administering the statute is assigned to the State Tax Assessor cuts in the same direction. So too does the fact that, throughout the body of the 1995 Act, the legislature consistently refers to its milk surcharge as a tax. *See, e.g.,* Me.Rev.Stat. Ann. tit. 36, § 4772 (caption); *id.* at § 4772(1) (describing the surcharge as "[a]n excise tax"); *id.* at § 4772(2) (discussing "[t]he rate of the tax levied"); *id.* at § 4772(3) (discussing "[c]alculation of tax"). Although such labels are not conclusive, *see Keleher v. New Eng. Tel. & Tel. Co.*, 947 F.2d 547, 549 (2d Cir.1991), they are entitled to some weight in the calculus of characterization.[4] *See Trailer Marine*, 977 F.2d at 6.

It is apparent that the surcharge's stated purpose is tax-like; in enacting it, the state

---

3. In all events, CFI could not mount a credible challenge on this point. Under Maine law, CFI can apply for a refund of any monies due pursuant to the 1995 Act within three years from the time a return is filed or two years from the time the tax is paid. *See* Me.Rev.Stat. Ann. tit. 36, § 144. If a refund is denied, CFI can seek judicial review in the state superior court, *see id.* at § 151, and any refund obtained would include interest, *see id.* at § 186. This remedy is sufficiently "plain, speedy, and efficient" to satisfy the second condition of the TIA. *See California v.*

*Grace Brethren Church*, 457 U.S. 393, 413–15, 102 S.Ct. 2498, 2510–12, 73 L.Ed.2d 93 (1982).

4. The weight is reduced in this instance because the Maine legislature, although using the word "tax" roughly three dozen times in the body of the statute and not using the word "fee" at all, described the legislation, in the Emergency Preamble, as "An Act to Continue the Fee on the Handling of Milk." *See* 1995 Me. Laws ch.2, Emergency Preamble.

legislature described it as a means of raising general revenues. This is a relevant factor in deciding the "tax versus fee" question. *See Chicago & N.W. Transp. Co. v. Webster County Bd. of Supervisors,* 71 F.3d 265, 267 (8th Cir.1995); *Travelers Ins.,* 14 F.3d at 713. Still, we recognize that the inverted structure of the surcharge furthers a regulatory purpose—to ensure stable (if elevated) milk pricing—and thus pulls the other way. Finally, the surcharge is imposed only on handlers of milk, not on all citizens (or even on all businesses); in this aspect, the surcharge more resembles a fee. *See Trailer Marine,* 977 F.2d at 6; *San Juan Cellular,* 967 F.2d at 685.

As we indicated in *San Juan Cellular,* 967 F.2d at 685, the characterization of a governmental assessment as a tax or a fee is rarely a choice between black and white. Many imposts fall into the gray area in the center of the spectrum. So it is here. While the question is close, we believe that Maine's milk handling surcharge falls nearer to the tax end of the spectrum than to the fee end. As *San Juan Cellular* suggests, the most salient factor in the decisional mix concerns the destination of the revenues raised by the impost—and here, the revenues go into Maine's general fund. Although this element alone is not always decisive, it is particularly important where, as here, the stated purpose of the impost is to garner revenue. *See Hager,* 84 F.3d at 870–71. In the circumstances of this case, this factor is sufficient to outweigh the few straws in the wind that point in the opposite direction.

CFI attempts to derail this result by using its "merits" argument as a jurisdictional foil. It tells us that, despite the legislature's declaration, the purpose of the milk handling surcharge is not to augment general revenues, but instead "to impose an exaction, akin to a regulatory fee, for the sole benefit of Maine dairy farmers." In order to reach this conclusion, however, we would have to view the milk handling surcharge in conjunction with the later subsidies to Maine dairy farmers as a single, integrated scheme, and we would have to disregard the Maine legislature's statement of purpose. This extraordinary step *might* be appropriate on the merits in a Commerce Clause case. *See West Lynn Creamery,* 512 U.S. at 201, 114 S.Ct. at 2215 ("Our Commerce Clause jurisprudence is not so rigid as to be controlled by the form by which a State erects barriers to commerce."). But there is neither any precedent nor any plausible jurisprudential basis for analyzing separate tax and subsidy statutes as an integrated unit under the Tax Injunction Act. Moreover, the need for doing so, while arguable in the Commerce Clause context, is chimerical in the TIA context: the risk is infinitesimal that a state legislature will contrive an ingenious scheme in order to deny lower federal courts the jurisdiction to adjudicate the legality of state exactions. Since aggrieved taxpayers may raise all their claims in a state forum, subject to eventual review by the United States Supreme Court, the game obviously would not be worth the candle.

### III.

### Conclusion

We can go no further. The Commerce Clause question is for the Maine state courts (and, perhaps, the United States Supreme Court) to decide. Because the TIA deprives us of jurisdiction to determine the constitutionality of Maine's milk handling surcharge, the judgment of the district court is vacated and the case is remanded with instructions to enter an order dismissing the action without prejudice to appropriate state proceedings.

*Vacated and remanded with instructions. No costs.*