**THE LAMAR COMPANY, LLC, et al., Plaintiffs,**

v.

**THE UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS, Defendant**

No. 03–2213–JWL.

United States District Court, D. Kansas.

March 4, 2004.

Darren K. Sharp, Edward R. Spalty, Karrie J. Clinkinbeard, Armstrong, Teasdale LLP, Kansas City, MO, for Plaintiffs.

Henry E. Couchman, Jr., Unified Government of Wyandotte County/KCK, Kansas City, KS, for Defendant.

## MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

This action arises out of the Unified Government of Wyandotte County/Kansas City, Kansas' ("Unified Government") decision to adopt an occupation tax on outdoor advertising services, i.e. billboards. In their complaint, plaintiffs allege that the tax violates numerous protections afforded by the United States and Kansas constitutions and that state law preempts the tax. In its answer to the complaint, the defendant alleges that the Tax Injunction Act (the "TIA"), 28 U.S.C. § 1341, precludes this court from exercising subject matter jurisdiction over plaintiffs' claims. Under the TIA, if an assessment is properly characterized as a tax, then the Act deprives this court of subject matter jurisdiction. If, on the other hand, the assessment is properly characterized as a regulatory fee, then it falls outside the scope of the Act and jurisdiction is proper.

On February 19, and 20, 2004, the court conducted a trial for the limited purpose of deciding whether the Unified Government's assessment on billboards is properly characterized as a tax or a regulatory fee under the Tax Injunction Act. For the reasons set forth fully below, the court concludes that the assessment on billboards is properly characterized as a tax, and the Tax Injunction Act deprives this court of subject matter jurisdiction over plaintiffs' claims. Specifically, the evidence demonstrates that the Unified Government adopted the occupation tax for the purpose of raising revenue, and it uses the funds for programs and services that benefit the public as a whole.

## PROCEDURAL HISTORY

After the Unified Government raised the Tax Injunction Act as an affirmative defense in its Answer, the parties agreed to file cross-motions for summary judgment on the limited issue of whether the occupation tax on billboards was a tax or a regulatory fee under the TIA. On February 6, 2004, the court denied both the plaintiffs' and defendant's motions for summary judgment. In reaching this conclusion, the court was guided by the Tenth Circuit's instruction that when determining whether an assessment is a tax or a fee "the critical inquiry focuses on the purpose of the assessment and the ultimate use of the funds." *Marcus v. Kan. Dep't of Revenue*, 170 F.3d 1305, 1309 (10th Cir.1999).

In denying the government's motion for summary judgment, the court found that the plaintiff had set forth specific facts showing that there was a genuine issue for trial. Specifically, the court highlighted summary judgment evidence suggesting that: (1) Mr. Speise proposed the assessment and he believes that billboards have a negative impact on the community; (2) the ordinance imposes the tax on each sign face and the amount of the assessment increases substantially for large signs; (3)

the Unified Government assesses and collects the tax unlike most other occupation taxes; (4) certain officials contemplated using an occupation tax on billboards to fund an Urban Planner position in the Planning and Zoning Department (the same department that regulates billboards), and in fact the Unified Government hired a planner soon after it adopted the occupation tax. When viewed in the light most favorable to the plaintiff, the court found that a rational trier of fact could infer from this evidence that the assessment was a regulatory fee.

In denying plaintiffs' motion for summary judgment, the court focused on defendant's summary judgment evidence suggesting that: (1) the Unified Government adopted the occupation tax as a revenue initiative in response to looming deficits; and (2) it committed the revenue generated from the tax to the general fund. The court found that this evidence demonstrated a genuine issue of material fact on the jurisdictional question. In short, because the court could not conclude "that reasonable inferences could not be drawn from facts" presented in the competing motions, it denied both plaintiffs' and defendant's motions for summary judgment.

## DISCUSSION

After thoroughly considering the evidence and arguments presented at trial, the court is now prepared to issue its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). In reaching its findings of fact, the court has relied to a considerable degree on its opportunity to form conclusions about the credibility of the witnesses based on its close observation of their demeanor and conduct while testifying at trial.

## I. Findings of Fact

Based on the evidence presented at trial, the court finds that the Unified Government adopted the occupation tax for the purpose of generating revenue, and that it uses the funds for the general benefit of the public.

### A. Purpose of the Assessment

■ The preponderance of the evidence demonstrates that the Unified Government adopted the occupation tax in response to looming budget deficits rather than to regulate the size or number of billboards in the defendant's jurisdiction. The plaintiffs' arguments to the contrary are unavailing.

### 1. The Unified Government Adopted the Occupation Tax to Sustain the Essential Flow of Revenue to the Government

To understand the purpose of the occupation tax, it is important to appreciate the political and financial variables that gave rise to the defendant's 2003 budget proposals. The Unified Government's budget is based on a calendar year (January through December). Kansas law requires the Board of Commissioners for the Unified Government (the "Board of Commissioners," the "Board," or the "Commission") to adopt a budget by August 15 of the preceding year and to certify that budget to the State of Kansas by August 25. To meet these deadlines, the defendant spends the first quarter of the preceding calendar year developing revenue forecasts and expenditure trends, assessing new program needs, and analyzing cash flows from the state and federal government. In the second quarter, the Unified Government develops specific budget proposals. In July, the County Administrator formally recommends a proposed budget to the Board of Commissioners. The Board, in turn, deliberates and adopts a final budget in August.

On July 1, 2001, County Administrator Dennis Hays, the chief administrative officer of the Unified Government, submitted the proposed 2002 annual budget to the Board of Commissioners, which included a proposal to increase city and county property taxes by more than ten percent. In public hearings, the citizens vehemently opposed the proposed increases, and the Commission was able to pass only a modest increase in property taxes. Based on the public's strong resistance, the defendant concluded that it had reached the community's maximum tolerance for property tax payments.

At the end of 2001, when administrators began to contemplate the 2003 budget, the Unified Government faced a serious financial situation. During that time period, the defendant was required to use general fund balances to address funding shortfalls, funding from the federal and state government was decreasing and unfunded mandates were on the rise. Based on these and other factors, the Unified Government projected that it would face a $25 million deficit between incoming revenue and outgoing expenditures over a three-year period extending from budget years 2003 through 2005. In short, by the end of 2001, the Unified Government faced serious revenue shortfalls, and it realized that raising property taxes was not politically feasible.

To address this situation, Mr. Hays formed three review teams (Team A, Team B and Team C) and assigned to them the task of developing proposals to increase revenue or reasonably reduce expenses by $8 million per year. A newly appointed Assistant County Administrator (Ed Smith, Doug Bach and Robert Roddy) headed each review team, and the members included a wide cross-section of Unified Government employees. On January 17, 2002, Mr. Hays circulated a memoran-

dum to Unified Government employees. In that memorandum, he announced the formation of the review teams and encouraged all employees to contribute to the process. This approach was unique. Traditionally, the Unified Government relied on finance and budget staff to develop budget proposals. While each department provided input, their proposals and recommendations were historically limited to issues affecting their own department. In contrast, the review teams were designed to transcend departmental boundaries and encourage a more systematic or holistic evaluation of the Unified Government's operations. The County Administrator characterized the creation of the review teams as an "extraordinary" measure that was needed in an "extraordinary year."

In response to this initiative, Steve Speise, then the Director of Planning and Zoning (the "Planning Department"), submitted a proposal to Team C, the team headed by Assistant County Administrator Robert Roddy. Mr. Speise suggested that the Unified Government impose an occupation tax on outdoor advertising companies and increase the existing sign permit fee. As to the occupation tax, Mr. Speise proposed to assess billboards based on their size and location. Mr. Speise further recommended that the tax be imposed on a "per structure" basis, as opposed to a "per sign face" basis.[1] Mr. Speise projected

that the occupation tax would generate $60,700 in annual revenue. Team C ultimately adopted this recommendation, along with 24 other initiatives, and forwarded it to the County Administrator. The County Administrator included the occupation tax, along with numerous other initiatives developed by the review teams, in the 2003 proposed budget.[2]

Team C requested that Casey Boudreau, Deputy Chief Counsel, draft an ordinance that would implement the proposed occupation tax. On July 31, 2002, Mr. Boudreau forwarded a draft ordinance implementing an occupation tax on billboards, along with other draft legislation, to the Board of Commissioners. All of the draft ordinances Mr. Boudreau submitted to the governing council implemented revenue initiatives contained in the proposed 2003 budget.

On August 1, 2002, the Commission held a public hearing in which it adopted the proposed 2003 budget. The Commission also considered five ordinances that implemented various revenue initiatives contained in that budget. Specifically, the Commission considered ordinances establishing a work release fee, increasing Municipal Court fees, increasing sewer connection fees, eliminating the Weights and Measures, along with the occupation tax on billboards. As drafted, Ordinance No. O–

---

1. Each billboard structure may include more than one sign face upon which advertising can be affixed.

2. In various supporting documents, the revenue initiatives are labeled or characterized as increases in "fees." In fact, in one document prepared by Wendy Murray, Director of Budget, she refers to the occupation tax as a "Billboard Fee." As such, the plaintiffs argue that the court cannot characterize the assessment on billboards as a tax where the Unified Government adopted both increases in fees and taxes in response to the budget crisis. This argument elevates form over substance.

*See Marcus*, 170 F.3d 1305, 1311 (explaining that the label given by a state for an assessment or charge is not dispositive). Ms. Murray testified that all of the new revenue initiatives contained in the proposed budget were designed to meet the goal of increasing revenue or decreasing costs by $8 million per year and that none of the proposed "fee" increases were adopted to defray the costs of regulation. This testimony demonstrates that, regardless of the label attached to the proposals in financial spreadsheets, the initiatives served the primary purpose of raising revenue, which is characteristic of a classic tax.

58–02 imposed an occupation tax on each billboard sign face. The amount of the assessment varied according to the size of the sign. The ordinance imposed a $250 assessment for sign faces of less than 300 sq. ft. and a $1,000 assessment for sign faces of 300 sq. ft. or more. At the end of the public hearing, the Commission adopted all five of the revenue initiatives. In particular, the Board of Commissioners adopted the occupation tax on billboards under its taxing authority. State law requires a municipality to approve a taxing ordinance by not less than two-thirds of the members-elect, and it gives the public the opportunity to challenge the ordinance by referendum. Consistent with state law, Ordinance No. 0–58–02 provides that it was approved by not less than two-thirds of the members elect. It further provides that the occupation tax will "take effect sixty-one (61) days after the final publication, unless a sufficient petition for referendum is filed and a referendum held on the ordinance . . . ."

On August 20, 2002, the Unified Government certified its 2003 budget to the State of Kansas. In that document, the defendant itemized dozens of funds that were tied to a tax levy. The occupation tax on billboards is listed as one such fund.

In the end, the evidence demonstrates that the Unified Government projected significant deficits. The County Administrator launched an initiative to develop proposals that would increase revenue and reasonably decrease expenditures. Mr. Speise responded to the initiative by proposing an occupation tax on billboards. Review Team C adopted Mr. Speise's proposal, along with numerous other revenue initiatives, in furtherance of its objective to increase revenue and/or decrease expenditures by $8 million per year. The County Administrator incorporated the occupation tax, along with numerous other revenue proposals, in the proposed 2003 budget,

and the Commission adopted the occupation tax under its taxing authority. This evidence demonstrates that the primary purpose of the occupation tax on outdoor advertising services is to sustain the essential flow of revenue to the government, not to regulate the quantity or size of billboards in the defendant's jurisdiction.

### 2. Plaintiffs' Arguments to the Contrary are Unavailing

Plaintiffs argue that the primary purpose of the occupation tax is to regulate the number and size of billboards in the defendant's jurisdiction. To support this conclusion, they rely on evidence that: (1) the proposal originated within the Planning Department and was prepared by Mr. Speise; (2) the assessment varies depending upon the number and size of billboard faces a company owns; and (3) the defendant assesses and collects the tax unlike other occupation taxes.

### a. Mr. Speise and the Planning Department's Role in the Passage of the Occupation Tax

Mr. Speise originally developed the occupation tax proposal. Plaintiffs argue that this evidences a regulatory motive because he harbors a personal animus toward billboards and has historically demonstrated a propensity to regulate the industry. Plaintiffs also argue that the purpose of the assessment is regulatory because the proposal came from the Planning Department, which is the department responsible for regulating billboards.

### (1) Mr. Speise's Role in the Occupation Tax

■ Mr. Speise originally proposed the occupation tax on billboards to Review Team C. At trial, he stated his belief that numerous billboards create a competitive

disadvantage for a community and, if given the option, he would prefer to see fewer billboards in Kansas City, Kansas. Mr. Speise also admitted that he prefers not to see any new billboards erected in the jurisdiction. Mr. Speise has also explored various options to regulate the billboard industry. In its order denying defendant's motion for summary judgment, the court found that a reasonable juror could infer a regulatory motive, in part, from similar evidence. However, no longer restrained by the standard governing summary judgment and given the freedom to weigh competing evidence, the court finds that Mr. Speise's beliefs do not in fact demonstrate that the Unified Government adopted the occupation tax with a regulatory motive.

Mr. Speise testified that he proposed the occupation tax in response to the administration's directive to enhance revenue sources. His testimony is corroborated by Wendy Murray, Robert Roddy, Abraham Neal (former License Administrator), Casey Boudreau, and Dennis Hays who all testified that the purpose of the occupation tax was to raise revenue. As an employee of the Unified Government, Mr. Speise felt an obligation to respond to the defendant's directive to increase revenue, and believed that if he did not contribute, his department could be the victim of cost-cutting measures. The court finds Mr. Speise's testimony to be credible and believes that these motives, not any personal animus toward billboards, motivated his conduct.[3]

Even assuming that Mr. Speise proposed the occupation tax as a veiled regulatory scheme, there is no evidence that subsequent decision-makers had knowledge of or embraced such a regulatory purpose. First, Mr. Speise testified that he did not discuss the notion of using the tax as a regulatory tool with Mr. Roddy, Mr. Hays or any individual in the budget department. Second, Mr. Roddy testified that he believed that the purpose of the occupation tax was to raise revenue, that his committee did not adopt the occupation tax as a means of reducing or eliminating billboards, and that he did not have any discussions with Mr. Speise about using the occupation tax a regulatory tool. Mr. Roddy forwarded his team's initiatives to Mr. Hays. Mr. Hays, in turn, testified that the purpose of the occupation tax was to generate new revenues, and that he did not have any discussions with Mr. Speise or Mr. Roddy about using the tax as a means of controlling the size or number of billboards in the jurisdiction. In fact, Mr. Hays testified that because the government was seeking new revenues, "more billboards would have been welcomed by the staff working on this portion of the project [because] it would have been additional revenues coming in." Mr. Hays forwarded the initiative to the Board of Commissioners. The plaintiffs produced no evidence suggesting that the Board of Commissioners adopted the ordinance for any purpose other than to raise revenue, or that they believed that Mr. Speise had proposed the occupation tax as a means to regulate billboards. By contrast, the defendants offered consistent, logical and highly credible testimony indicating that the purpose of the assessment was to raise revenue.

Plaintiffs argue that Mr. Boudreau, the attorney who drafted the ordinance, was a decision-maker who shared Mr. Speise's regulatory motive. However, Mr. Boudreau testified credibly that the purpose of

---

**3.** Plaintiffs contend that Mr. Speise's own proposal evidences a regulatory intent. In the text of a footnote contained in his original proposal, Mr. Speise stated that "it is anticipated that several of the structures would be removed in response to this tax." However, Mr. Speise testified credibly that he was referring only to abandoned or obsolete structures that no longer generated advertising revenue.

the occupation tax ordinance that he drafted in 2002 was to raise revenue and that he did not believe that the assessment would reduce or eliminate billboards in Kansas City, Kansas. Plaintiffs also note that Mr. Boudreau relied on a 1997 draft ordinance, which stated that billboards "have a major visual impact in the community." [4] When read in context, the 1997 draft ordinance provided:

> Currently, billboards are taxed as personal property, but are quickly depreciated. They, therefore, often pay little in ad valorem property taxes. In some cases, the signs are located on street and railroad right-of-ways and the property on which the sign is located also do not pay substantial property tax. The signs, however, have a major visual impact in the community.

Mr. Boudreau testified that this language simply reflected the Unified Government's belief that it should realize a greater tax benefit from this use. He further testified that the purpose of the 1997 draft ordinance was to raise revenue. Given this uncontroverted testimony, the court finds that Mr. Boudreau did not draft the occupation tax ordinance to regulate billboards.

### (2) The Planning and Zoning Department

Independent of Mr. Speise's beliefs, plaintiffs argue that the occupation tax is a regulatory fee because the proposal originated in the Planning Department, the department responsible for regulating billboards. On summary judgment, the court found that a reasonable juror could infer a regulatory motive from this, among other evidence. However, the evidence presented at trial demonstrates that the origin of the proposal within the Planning Department does not in fact suggest a regulatory motive. Plaintiffs' argument overstates the role billboard regulation plays within the overall operation of the department.

Mr. Speise explained that the Planning Department is primarily responsible for developing the Unified Government's land use plans and administering its zoning and subdivision ordinances. As to billboards, Mr. Speise testified without contradiction that the only regulatory function the Department performs is issuing permits for new signs. Even that authority is limited because the Planning Department does not ultimately decide whether or not a permit will be issued. Instead, it makes a recommendation to the Planning Commission, which in turn, makes its recommendation to the Board of Commissioners. The Board of Commissioners ultimately decides whether or not to issue a permit. Once a permit is issued, Mr. Speise explained, the Planning Department has no ongoing regulatory function over outdoor advertising signs. In the end, Mr. Speise estimated that the Department spends less than one percent of its time regulating billboards. Mr. Speise's uncontroverted testimony demonstrates that the fact that the proposal originated within the Planning Department does not taint it with a regulatory purpose.

### b. Design and Structure of the Tax

Plaintiffs argue that the Unified Government intended to regulate the number and size of billboards by structuring the ordinance so that: (1) the assessment is imposed on each billboard sign face, as opposed to a flat assessment on billboard

---

**4.** Plaintiffs also contend that the 1997 draft occupation tax was drafted along with other taxes targeting undesirable land uses. Plaintiffs argue that this implies a regulatory purpose. However, Mr. Boudreau testified that some of the 1997 proposals taxed land uses that the public did not perceive to be undesirable. Moreover, he testified that all of the proposals were drafted as a means to raise revenue. The court finds his testimony credible.

companies; and (2) the amount of the fee increases substantially based on the size of the sign face. On summary judgment, the court concluded that this, along with other evidence, demonstrated a material issue of fact as to whether the assessment was a tax or a fee. However, given the opportunity to weigh the parties' competing evidence presented at trial, the court finds that the design and structure of the ordinance does not give rise to an inference of a regulatory purpose.

### (1) "Per Sign Face" Assessment v. "Per Location" Assessment

Plaintiffs note that the Unified Government's occupation taxes typically impose a flat fee on each business location, instead of assessing the tax on a per unit basis. By assessing each billboard sign face (instead of assessing a flat fee on each business location),[5] plaintiffs suggest that the Unified Government intended to drive billboards out of the marketplace by rendering them economically nonviable. However, the evidence presented at trial does not support this conclusion.

First, the structure of the tax is consistent with the Unified Government's objective to raise additional revenue. Mr. Boudreau testified that the Unified Government could generate more revenue by imposing a tax on each sign face, instead of imposing a flat tax on each company. Moreover, the Unified Government believed that the structure fairly distributed the tax liability among billboard companies in the jurisdiction. Mr. Boudreau explained that a flat tax on each billboard company would unfairly burden small companies that own only a handful of signs. In contrast, he stated his belief that an assessment on each sign face more accurately reflects a billboard company's activity and presence in the community. Finally, assessing the tax on each sign face was expedient. Mr. Boudreau explained that state law prohibits the municipalities from assessing an occupation tax on companies based on their gross revenues, and assessing billboards on a square foot basis would have created new administrative burdens. In contrast, a sign face is a readily discernable unit. The court finds Mr. Boudreau's testimony to be credible and consistent with the defendant's other evidence suggesting that the Unified Government's motive in passing the occupation tax was to raise revenue.

Second, the Unified Government frequently levies an occupation tax based on the size, volume, or output of a business. For example, manufacturers, wholesalers, processors, retailers and public warehousers pay an occupation tax based on the number of total square feet occupied by the business. Other occupations are taxed on a volumetric and output basis. Landfills are assessed a tax for each cubic yard of permitted net air space. Medical

5. Plaintiffs' original premise, that the Unified Government does not impose the tax on a "per location" basis, is somewhat suspect. The Unified Government levies occupation taxes on the privilege of engaging in any business within the city. If a person maintains more than one "place of business," he or she is required to pay an occupation tax for each place of business. Plaintiffs conclude that the tax on billboards is assessed on a "per unit" basis (not a "per location" basis) because the Unified Government assesses each billboard sign face. However, unlike retail outlets, where there are distinct and readily identifiable "places of business," it is unclear what constitutes a "place of business" for a billboard company. It would not be unreasonable to conclude that for this industry, each separate sign constitutes a place of business. While not suggesting that this is the proper interpretation of defendant's occupation tax code, it demonstrates that the structure of the tax may simply reflect the ambiguities that arise when applying the phrase "place of business" to the billboard industry.

waste incinerator facilities are assessed based on their per pound hourly put-through capacity. Likewise, used oil truck-to-rail transfer facilities and used oil processing facilities are assessed based on their per gallon daily put-through capacity.

Plaintiffs argue, however, that the defendant reserves assessments based on the volume, size or output of a business only for land uses that the public perceives to be undesirable, i.e., for uses such as land-fills and medical waste incinerators. This argument ignores the fact that the Unified Government assesses an occupation tax on benign land uses employed by wholesalers, processors, retailers, and warehousers based on the size of their facility, instead of on a "per business" or "per location" basis. It also inaccurately assumes that the Unified Government adopted the assessments on landfills, medical waste incinerators and other similar land uses to regulate those industries. This assumption does not comport with the credible testimony of defendant's witnesses concerning the purpose of those tax initiatives. As to the assessments on landfills and medical waste incinerators, Mr. Boudreau testified that once the predecessors to the Unified Government granted those facilities special use permits in the early 1990s, it decided that some revenue should flow from those land uses. Defendant retained the services of a law firm in Washington, D.C. to explore the best way to generate revenue from these operations. After considering several mechanisms, the law firm recommended that the Commission use its taxing powers to generate revenue. In turn, the Unified Government implemented an occupation tax on these facilities. Mr. Boudreau further testified that when the Unified Government increased the amount of those fees in 1997, it intended to raise additional revenue for its coffers. This evidence demonstrates that the Unified Government has historically assessed these land uses to generate revenue, and not to regulate land uses that the public perceives to be undesirable.

In the end, the Unified Government raises more revenue by assessing an occupation tax on each sign face, instead of applying the tax on a "per company" or "per structure" basis. Plaintiffs' claim that similar tax structures are reserved for undesirable land uses does not withstand scrutiny. As such, the court does not infer from the evidence presented at trial that the structure of the assessment demonstrates a regulatory motive.

### (2) Amount of the Assessment on Larger Billboards

The occupation tax imposes a $250 fee for billboard sign faces of less than 300 sq. ft. The assessment increases to $1,000 for sign faces of 300 sq. ft. or larger. Plaintiffs ask the court to infer from this design that the Unified Government intended to regulate the size of billboards in the community. The evidence presented at trial does not support such an inference.

Instead, the evidence suggests that the Unified Government imposed a higher assessment on larger signs to reflect the economic benefit billboard companies receive from those structures, and not to reduce the number of large signs in the jurisdiction. The defendant's zoning code places outdoor advertising signs into three categories: bulletins, poster panels, and junior poster panels. A bulletin is a sign between 300 and 925 sq. ft. A poster panel is a sign between 100 and 300 sq. ft. A junior poster panel is a sign not exceeding 100 sq. ft. Mr. Boudreau testified that larger signs (bulletins) are usually located along interstate highways, while smaller signs (poster panels and junior poster panels) are located next to buildings or along city streets. Because bulletins are exposed to higher traffic flows, advertisers pay a higher premium to place copy on

those sign faces. According to Mr. Boudreau, the Unified Government levies a $1,000 tax on bulletins to reflect the fact that they generate more revenue than the smaller signs. In other words, the tax more accurately reflects the benefit billboard companies receive from that use. Additionally, both Mr. Speise and Mr. Boudreau testified that they did not believe the $1,000 assessment on larger signs would reduce the number of bulletins in Kansas City, Kansas. Mr. Boudreau's uncontroverted testimony demonstrates that the rate of the assessment on larger billboards simply reflects the economic value billboard companies realize from that land use. Moreover, neither Mr. Speise (who originally proposed the tax) nor Mr. Boudreau (who drafted the ordinance) believed that it would render large billboards unprofitable. Based on this evidence, the court does not infer a regulatory motive from the fact that the occupation tax imposes a larger fee on sign faces of 300 sq. ft. or more.

### c. Administration of the Occupation Tax

On summary judgment, plaintiffs made much of the fact that the occupation tax on billboards was assessed and collected unlike any other occupation tax in defendant's jurisdiction. While the Business License Division (the "License Division") is typically responsible for assessing and collecting occupation taxes, plaintiffs argue that the License Division relies on the Planning Department to administer the occupation tax on billboards. From this fact, the plaintiffs suggest that the occupation tax is characteristic of a regulatory fee used to offset the costs of administering a regulatory scheme. However, the Planning Department's role in the administration of the occupation tax on billboards is minimal and consistent with the type of assistance other departments provide to the License Division.

The ordinance implementing the occupation tax on billboards did not delegate to the Planning Department any authority to assess or collect occupation taxes. Thus, the License Division retained responsibility for administering this tax. Abraham Neal, then the License Administrator, explained that in order for his division to collect the occupation tax on billboards, it needed to know who owned billboards, how many sign faces they owned, and the sizes of their sign faces. Mr. Neal testified that the License Division did not maintain that information at the time the occupation tax became effective, so he asked Mr. Speise for assistance. In response, Mr. Speise provided Mr. Neal with a spreadsheet that contained the information the License Division requested. Mr. Neal testified that it is not unusual for his division to rely on information provided by other Unified Government departments in administering occupation taxes. Based on Mr. Neal's credible testimony, it is clear that the Planning Department's role in the administration of the occupation tax is limited and consistent with the assistance other departments provide to the License Division. Thus, the court does not find that this involvement evidences a regulatory purpose.

In the end, the occupation tax on billboards was one stick in a bundle of proposals that the Unified Government adopted to address its pending financial crisis. While the tax, like most taxes, may have an economic impact on the assessed market, that does not suggest that the purpose is regulatory. The preponderance of the evidence presented at trial demonstrates that the purpose of the tax was to ensure the essential flow of revenue to the government, not to manipulate economic variables to achieve a reduction in the size or number of billboards in Kansas City, Kansas.

### B. Use of the Funds

The preponderance of the evidence demonstrates that the Unified Government uses the occupation tax revenue for the general welfare, not to cover the costs of regulating billboards. The defendant places all occupation tax revenue in its general fund.[6] The general fund, in turn, finances public safety (police, fire, sheriff, emergency management), legal, finance, parks and recreation, and other services that benefit the community as a whole.

Plaintiffs argue, however, that the Unified Government intended to use the revenue from the occupation tax to hire an additional planner in the Planning Department, thereby furthering its mission to regulate billboards or to offset the costs of administering the billboard tax. Both the plaintiffs' original premise and its resulting inference are unfounded.

As to the Unified Government's alleged intent to use the revenue to fund a planner position, plaintiffs rely on a September 23, 2001 memorandum from Bob Evans to Penny Postoak, the former Director of Budget. In that memorandum, Mr. Evans proposes hiring one planner, at an annual cost of $55,000, with an increase in sign permit fees and an outdoor advertising occupation tax. In fact, the Unified Government hired a planner soon after it adopted the occupation tax. Despite these facts, the weight of the evidence demonstrates that the Unified Government did not adopt the occupation tax to fund a new planner position.

Ms. Murray, the Director of Budget, testified that she never saw Mr. Evans' memorandum prior to this litigation. She further indicated that she did not discuss the proposals within that memorandum with Mr. Evans before preparing the 2003 budget. Mr. Roddy testified that there was no link between the occupation tax on billboards and the planner position that was funded in 2003. While the Unified Government paid for the planner position with money from the general fund, Ms. Murray testified that the defendant did not earmark occupation tax revenue for that purpose. The court finds Ms. Murray and Mr. Roddy's testimony to be credible.

The evidence also demonstrates that the Unified Government did not hire the planner to further any regulatory scheme concerning billboards or to cover the costs of administering the billboard tax. Mr. Roddy testified that the Unified Government budgeted for an additional planner in response to an influx of growth and new development on the western side of Kansas City, Kansas. He explained that the Planning Department was not adequately staffed to handle the additional work load created by this new development. This testimony is corroborated by the fact that the new planner has not participated in the billboard permitting process or any other tasks incidental to administering the occupation tax on billboards. Instead, Scott Murray, the Urban Planner hired in November of 2003, testified that he performs three duties. First, his primary duty is to work on a new comprehensive plan for the City of Kansas City, Kansas. Second, and to a lesser extent, he is responsible for coordinating several affordable housing programs in the city. Finally, he fulfills several day-to-day tasks such as working on requests for zoning changes, answering the phones, and interacting with customers of the Planning Department. This evidence demonstrates that the Unified Gov-

---

6. In 2003, the Unified Government collected only $6,750 from the tax on outdoor advertising signs. Ms. Murray testified that the Unified Government realized that it would not collect its projected revenue estimates from the occupation tax because of the pending litigation. As such, the Unified Government reduced its revenue estimates from $60,000 to $6,750 in the amended 2003 budget.

ernment included an additional planner position in the 2003 budget to respond to growth and development, not to further any billboard regulatory scheme.

In the end, the Unified Government has committed the occupation tax revenue to its general fund, which finances programs and services that benefit the general public. While the defendant hired an Urban Planner in 2003, the evidence demonstrates that there is no connection between that position and the occupation tax on billboards.

## II. Conclusions of Law

The sole issue before the court is whether the Unified Government's occupation tax on outdoor advertising signs constitutes a tax or a regulatory fee for purposes of the Tax Injunction Act. If the assessment is properly characterized as a tax, then the Tax Injunction Act deprives this court of subject matter jurisdiction over the underlying constitutional challenges to the defendant's ordinance. If, on the other hand, the assessment is properly characterized as a fee, then it falls outside the scope of the Act and jurisdiction is proper. "Because the jurisdiction of federal courts is limited, 'there is a presumption against our jurisdiction, and the party invoking federal jurisdiction bears the burden of proof.'" *Marcus v. Kan. Dep't of Revenue*, 170 F.3d 1305, 1309 (10th Cir.1999) (quoting *Penteco Corp. v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir.1991)).

The Tax Injunction Act provides: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The Act "imposes a 'broad limitation on federal court interference with state collection of taxes [and] is not limited to injunctive relief.'" *Marcus*, 170 F.3d at 1309 (10th Cir.1999) (quoting *Brooks v.*

*Nance*, 801 F.2d 1237, 1239 (10th Cir.1986) (internal citations omitted)). "'The Tax Injunction Act bars declaratory relief, and suits for damages as well.'" *Id.* While the Act makes no mention of local taxes, it has long been established that it applies to local taxes as well as state taxes. *Collins Holding Corp. v. Jasper County, S.C.*, 123 F.3d 797, 799 n. 2 (4th Cir.1997).

"The purposes of the Act are 'to promote comity and to afford states the broadest independence, consistent with the federal constitution, in the administration of their affairs, particularly revenue raising.'" *Id.* (quoting *Wright v. McClain*, 835 F.2d 143, 144 (6th Cir.1987)). "Thus, the Tax Injunction Act operates to divest the federal courts of subject matter jurisdiction over claims challenging state taxation procedures where the state courts provide a plain, speedy and efficient remedy." *Id.* (quotations omitted).

The court applies a bifurcated analysis to determine whether the Tax Injunction Act bars federal jurisdiction. First, the court must determine whether the law in question imposes a tax or merely a regulatory fee. *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir.1998). "Second, even if the law imposes a tax for purposes of the Tax Injunction Act, a district court may decline to exercise jurisdiction only if the state court is equipped to furnish the plaintiffs with a plain, speedy, and efficient remedy." *Id.*

### A. Tax v. Fee

The Tenth Circuit has described the characteristics that distinguish the classic tax from the classic fee:

[T]he classic tax sustains the essential flow of revenue to the government, while the classic fee is linked to some regulatory scheme. The classic tax is imposed by a state or municipal legislature, while

the classic fee is imposed by an agency upon those it regulates. The classic tax is designed to provide a benefit for the entire community, while the classic fee is designed to raise money to help defray an agency's regulatory expenses.

*Marcus*, 170 F.3d at 1311 (quoting *Home Builders Ass'n of Miss., Inc.*, 143 F.3d at 1011). In deciding whether an assessment falls closer to the classic tax or the classic fee within this spectrum, the "label given by a state for an assessment or charge is not dispositive." *Marcus*, 170 F.3d at 1311 (citing *Wright*, 835 F.2d at 144 (6th Cir. 1987)). "Instead, the critical inquiry focuses on the purpose of the assessment and the ultimate use of the funds." *Id.* (citing *Collins Holding Corp.*, 123 F.3d at 800; *Hager v. City of West Peoria*, 84 F.3d 865, 870–71 (7th Cir.1996); *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n*, 967 F.2d 683, 685 (1st Cir.1992)).

Here, the evidence demonstrates that within the spectrum, with a classic tax at one end and a classic fee at the other, the assessment on billboards is clearly a tax. As noted in the previous section, the Unified Government adopted the tax for the purpose of sustaining the essential flow of revenue in the face of looming budget deficits. Moreover, the revenue from the tax is committed to the general fund, which is used to fund programs that benefit the community as a whole. *See Cumberland Farms, Inc. v. Tax Assessor, State of Me.*, 116 F.3d 943, 946 (1st Cir.1997) (noting that the fact that revenues go into state's general fund favors a finding that the surcharge is a tax); *Travelers Ins. Co. v. Cuomo*, 14 F.3d 708, 713 (2d Cir.1993) (holding that because contested surcharges raise revenue ultimately paid into state's general fund, they constitute taxes for purposes of the TIA), *rev'd sub. nom. on other grounds, N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995).

These factual findings distinguish this case from the assessments at issue in *Marcus*. There, the appellants originally filed an action challenging the constitutionality of a $5.25 fee associated with the issuance of handicapped parking placards and identification cards that authorize individuals with disabilities to park in specially designated parking spaces. The district court granted defendants' motion to dismiss after finding that the assessment was a tax and not a regulatory fee under the TIA. 170 F.3d at 1308. On appeal, appellants argued that the assessment constituted a regulatory fee. The $5.25 assessment at issue in *Marcus* was comprised of two components. First, an individual was required to pay a $2.25 service fee to the county treasurer. 170 F.3d at 1307. This portion of the assessment was levied on all persons applying for vehicle registration renewal, not just on individuals applying for disabled parking placards. *Id.* The county treasurer was required to deposit the $2.25 into a special fund that is used to pay for necessary help and expenses incidental to the administration of the county treasurer's duties. *Id.* If there is a balance in the fund at the close of the calender year, the money was credited to the general fund. *Id.* Second, an individual was required to pay a $2.00 fee for a placard and a $1.00 fee for an identification card. *Id.* State law provides that these fees " 'shall not exceed the actual cost of issuance' of the identification cards and placards." *Id.* (quoting K.S.A. § 8–1,125(c)). The district court found that these assessments were taxes and that the TIA deprived the court of subject matter jurisdiction.

In reversing the district court, the Tenth Circuit noted that, as to the $2.25 portion of the assessment, "[w]hile some part of the funds collected pursuant to section 8–145d may ultimately reach the general fund of the county . . . or the state highway

fund... the governing statute expressly ties these monies to the administration of the motor vehicle registration laws." *Id.* at 1311. In short, "[b]oth the relevant statutory language and Kansas case law make clear that the $2.25 portion of the assessment is used primarily to cover the costs of administering the motor vehicle registration laws." *Id.* at 1312. Thus, the Tenth Circuit did not conclude that the "dominant purpose" of these funds was revenue raising, nor did it conclude that the funds benefitted the general public. *Id.* Similarly, with respect to the $3.00 fee for disabled parking placards and identification cards, those charges are "expressly linked to defraying administrative costs." *Id.* As such, the court concluded that the "essential character" of the assessment was regulatory. *Id.*

As explained above, unlike the fees in *Marcus*, the occupation tax ordinance does not tie that revenue to any regulatory scheme pertinent to the outdoor advertising industry, nor does it require the revenue to be used to defray the costs of any such regulation. Instead, like other occupation taxes, the revenue is committed to the defendant's general fund. Thus, unlike the assessment in *Marcus*, the dominant purpose of the occupation tax is to raise revenue and the funds are used to benefit the general public.

■ Plaintiffs presented evidence suggesting that the occupation tax may render some billboards economically nonviable in Kansas City, Kansas. However, the fact that an assessment has an impact or effect on an economic market does not demonstrate that the assessment is a fee under the TIA. For example, in *Cumberland Farms, Inc. v. Tax Assessor, State of Me.*, 116 F.3d 943, 946 (1st Cir.1997), the court examined whether an assessment on milk handlers was a tax or a fee under the TIA. The State of Maine originally passed the Maine Dairy Farm Stabilization Act, which contained two components. First, it imposed a tax on packaged fluid milk sold in Maine regardless of the origin of production. *Id.* at 944. Second, it provided a rebate of the funds so collected to in-state dairy farmers. *Id.* The amount of the tax varied from 0 cents and 5 cents per quart of milk and increased as the "basic price" of milk fell below the target price of $16.00 per hundredweight. *Id.* The First Circuit struck down the Maine Dairy Farm Stabilization Act, finding that there was no significant constitutional distinction between that Act and the Massachusetts law the Supreme Court invalidated in *West Lynn Creamery*. *Id.* In response, the Maine legislature enacted "An Act to Continue the Fee on the Handling of Milk." *Id.* The 1995 Act assessed a surcharge on milk handlers that was nearly identical to that previously mandated by the Maine Dairy Farm Stabilization Act, but directed that the revenues generated from the fee be deposited into Maine's general fund. *Id.* at 945. The preamble to the legislation recited that "the State and its citizens are experiencing economic difficulties and significant fiscal problems" such that "revenues are necessary to the State's ability to address such difficulties and problems." *Id.* at 944. The First Circuit recognized that the assessment manipulated the dairy market by ensuring a more stable price of milk. *Id.* at 947. Even so, it found "the most salient factor in the decisional mix concerns the destination of the revenues raised by the impost—and here, the revenues go into Maine's general fund." *Id.* The court noted that while "this element alone is not always decisive, it is particularly important where, as here, the stated purpose of the impost is to garner revenue." *Id.*

Here, as in *Cumberland Farms, Inc.*, the stated purpose of the occupation tax was to raise revenue in response to the defendant's economic difficulties, and the revenue was placed in the general fund,

which strongly suggests that it is a tax. In fact, the occupation tax ordinance makes a stronger case for a "tax" than the assessment in *Cumberland Farms, Inc.* There, the evidence suggested that state legislators intended to achieve the regulatory objective of stabilizing the price of milk for Maine dairy farmers in the aftermath of the court's decision to strike down the Maine Dairy Farm Stabilization Act. Here, at best, the evidence suggests that the occupation tax could have a secondary effect on the billboard market, but that the primary purpose of the ordinance is to raise revenue.

In the end, the evidence demonstrates that the Unified Government adopted the occupation tax to generate revenue, not to regulate the number or size of billboards in the defendant's jurisdiction. Moreover, this revenue is dedicated to the defendant's general fund. These characteristics are more typically associated with a classic tax than a classic fee and, therefore, the court concludes that the occupation tax on billboards is a tax under Tax Injunction Act.

### B. Plain, Speedy and Efficient State Remedy

Neither the plaintiffs nor the defendant presented any evidence as to whether the State of Kansas offers a plain, speedy and efficient remedy to the plaintiffs. Given that the plaintiffs have the burden of proving the existence of subject matter jurisdiction, this exception to the TIA does not apply in this case. *Marcus,* 170 F.3d at 1308 (noting that where plaintiffs did not allege the absence of a plain, speedy, and efficient remedy in state courts, this exception to the TIA did not apply). Moreover, without elaborating upon any specific procedure, it appears that Kansas courts provide an adequate forum to address plaintiffs' challenges to the occupation tax. *See, e.g., Home Builders Ass'n of Greater Kansas City v. City of Overland Park,* 22 Kan.App.2d 649, 921 P.2d 234 (1996) (plaintiff challenged validity of municipal ordinance levying an assessment on the privilege of engaging in the business of platting real property); *Brewster v. City of Overland Park,* 233 Kan. 390, 661 P.2d 1240 (1983) (plaintiffs brought action to enjoin the city from enforcing an ordinance that levied an occupation tax on the legal profession).

### CONCLUSION

After thoroughly considering the evidence and arguments presented at trial, the court finds that the purpose of the occupation tax is to generate revenue for the Unified Government and the funds are ultimately used for the general benefit of the public. As such, the court concludes that the assessment on billboards is properly characterized as a tax and, therefore, the Tax Injunction Act deprives this court of subject matter jurisdiction.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiffs' complaint be dismissed for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**